LAND, J.
This is a petitory action to recover an undivided fourth interest in and to certain batture land alleged to have been formed by accretions since the year 1854.
The petition sets forth that plaintiffs are the sole heirs of William J. Minor; that their said ancestor in the year 1850 obtained á final judgment against Municipality No. 2-in the United States Circuit Court of the Eastern District of Louisiana, recognizing' him- *165 as the- owner of an undivided fourth interest in certain hatture land in the First District of the city of New Orleans, lying between and within certain streets and the Mississippi river, as shown by map attached to a deed executed in 1820, and particularly described in said petition; that the said Minor in the year 1854 sold said interest in said property and whatever batture had been attached thereto by accretion to the city of New Orleans, reserving, however,- a like interest in all future batture accretions that might attach to the property conveyed; that in the year 1854 the outside edge of the levee or river line was located at or about what is now Delta street; that the accretions formed since 1854 in front of said above-described land, worth about $40,000 and all future accretions thereto, constitute the property in which plaintiffs claim an -undivided fourth interest; that such accretions already formed are largely in excess of what is necessary for public use; and that the city of New Orleans is in possession of the said land in its capacity as the administrator of the public servitudes imposed by law on riparian estates, and refuses to deliver possession to plaintiffs.
Plaintiffs prayed that their alleged ownership be recognized in the said batture formed since the year 1854, and that plaintiffs be put in possession of all that portion of the same not necessary for-public use, in accordance with section 318 of the Revised Statutes of 1870.
The board of commissioners of the port of New Orleans was made a codefendant by supplemental petition.
Defendant filed an exception of no cause of action and one of nonjoinder, which were tried and overruled.
Defendants then answered, and, after pleading the general issue, specially averred that the property described in plaintiffs’ petition is necessary for the commerce of the port of the city of New Orleans, and is now, and always has been, actually used for said purpose. Defendants further averred that the clause in the act of sale from Minor to the city passed in 1854, reserving future batture accretions, was null and void, being contrary to law.
The case was tried on the merits, and during the trial defendants filed a plea of res judicata and plea of prescription of 1 to 30 years.
The plea of res judicata was sustained, and the suit dismissed. Plaintiffs appealed.
Res Judicata.
In 1850 William J. Minor recovered judgment in United States Circuit Court, Eastern District of Louisiana, against Municipality No. 2 of the city of New Orleans for the undivided one-fourth part of a tract or parcel of land lying with certain map lines and limits, to wit:
“New Levee Street, the Mississippi River, and the lines O D and M N above described, extended to the River, together with all the alluvial and other riparian rights and privileges belonging thereto.”
In 1854 W. J. Minor, through his agent, John M. Chilton, sold to the city of New Orleans the same property described in-said judgment, together with all its appurtenances, “excepting only the future batture accretion,” which was reserved to said Minor, the vendor.
In the year 1876 the widow and heirs of W. J. Minor brought suit against the Life Association of America to recover lots 7 and 8 in the square bounded by Poydras, Front, G-ravier, and Delta streets.
Plaintiffs in said suit based their claim of title on the -judgment rendered by United States Circuit Court, in 1850, and their petition contains no reference whatever to the sale made by Minor to the city of New Orleans in 1854.
The defendant answered, pleading that the property sued for was embraced in the sale of 1854 from Minor to the city, and that *166 the reservation therein in favor of the vendor of all future batture accretion was null and void.
The defendant called the city in warranty. The city answered plaintiffs’ petition and defendants’ call in warranty; pleading the general issue, and specially denying any liability in warranty arising from her sale of the property to the authors of defendant, because she sold them “what she had acquired by purchase from Wm. X Minor.” The city further pleaded the prescription of 10 and 20 years.
The plaintiffs thereupon filed an anomalous pleading, styled an “answer” to the allegations of the city to the call in warranty, and denied the ownership of the city to the entire “property in front of Front street to the water’s edge,” on the ground that one undivided fourth of the same had been reserved by William X Minor in his sale to the city, passed in 1854. Wherefore plaintiffs prayed for judgment against the city of New Orleans, recognizing them as owners of said interest.
In June, 1887, plaintiff and defendant agreed that the case be submitted on the pleadings, and plan of square in which the property was situated, and the certificate of the city surveyor, “and the court to enter up judgment at once for defendant.”
In July, 1877, judgment was entered up pursuant to said agreement as follows, viz.:
“It is ordered, adjudged, and decreed that there be judgment in favor of defendant the Life Association of America, dismissing plaintiff’s petition and demand, with costs.”
In November, 1877, pursuant to a written agreement between plaintiffs’ counsel and the attorneys of the defendant company, the judgment of June, 1877, was annulled, and the case reopened for further proceedings.
On the second trial of the case, judgment was rendered and signed February 5, 1878, in favor of the Life Association of America and against the plaintiffs, with costs; dismissing the call in warranty against the city, and dismissing the reconventional demand of the plaintiffs against the city of New Orleans, “with costs as in case of nonsuit.”
The city of New Orleans was no party to the consent judgment rendered in July, 1877, and was not and could not be affected by the decree agreed upon between the plaintiffs .and the defendant.
§ueh consent judgment decided nothing, as far as the city was concerned, and, as it affected only the parties to the agreement, it was competent for them to vacate the judgment by the same consent which created it. But the city was a party to the judgment rendered in January, 1878, whether she was represented by counsel at the trial or not, and this judgment is conclusive on all the parties to the suit. As to the demands urged in the petition in the present suit, the judgment was one of nonsuit. This is the last judgment, “and, where there are two conflicting judgments in the same ease, the later in point of time must prevail.” Black on Judgments, 509.
Oonceding that the consent judgment was final and could not be vacated by the same consent which created it, the record shows that such judgment was based on an agreed statement of facts in the form of a certificate, which showed that the two lots involved in that suit formed a portion of the property conveyed by Minor to the city in 1854. As the batture now in dispute was not then in existence, and as plaintiffs claim under a reservation in the sale of 1854, the thing demanded and the issue are not the same.
By the judgment of the United States Circuit Court rendered in 1850, Minor became the owner in indivisión with the city of an undivided fourth of a strip of ground, measuring about 56 feet front.
In 1851 the city, by virtue of a conveyance from a large number of riparian owners acquired all the land and appurtenances ly *167 ing between Front street and tbe Mississippi river.
In 1854 Minor sold Ms interest in said strip to tbe city of New Orleans, excepting and reserving, however, all future batture accretions.
Defendants’ counsel argue with much learning and ability that such a reservation is null and void, because the right to accretions can exist only in favor of the owner of the soil fronting the stream, and such right cannot be detached or separated from the right of ownership by agreement of vendor and vendee.
Of course, in the absence of agreement to ' the contrary, such accretions would have become the property of the owner of the land. “Future things may be the object of an obligation.” Oiv. Code, art. 1887. “Things to come,” or “what shall accrue from an estate,” may be sold. Civ. Code, art. 2450. Hence the object of the contract was lawful. The consideration was the transfer of the vendor’s interest in the existing batture, with the reservation of future accretions. Whether such accretions, where formed, should become the property of the vendor or vendee, did not concern the public. What provision of law forbade the agreement of the parties that such accretions should not pass to the purchaser, but should be reserved to the vendor? It is true that the accretions attached to land owned by the city, but by the stipulations of the contract they inured to the benefit of Minor. “Agreements legally entered into have the effect of laws on those who have formed them.” Civ. Code, art. 1901. We have no state jurisprudence on the subject of the reservation of future accretions, or their sale separately from the shore land, but that riparian rights may be severed or disassociated from the shore land and sold or reserved by the owner has been held in a number of eases- decided in other states of the Union. See Am. & Eng. Ency. Law (2d Ed.) 981, 982.
In People v. Jones, 112 N. Y. 606, 20 N. E. 579, the court said:
“Neither can it be doubted but that a riparian proprietor conveying lands adjacent to navigable waters may so limit his grant as to reserve to himself not only his riparian privileges in the water, but also subsequent accretions to the soil formed by the operation of natural causes. This follows necessarily from the absolute right which the owner has to impose such terms and conditions upon his grants as he may deem necessary or proper.”
It is true that in said case the court found that the grantor had reserved some interest in the shore, but at the same time expressed-the opinion that the result would have been the same if privileges in the water or subsequent accretions had been reserved.
We therefore are of opinion that there is-nothing unlawful or impossible in the reservation of future batture accretions, and that this condition in the deed should be recognized and enforced.
The parcel of ground in dispute is a narrow strip, measuring 36 feet and 1 inch and 6 lines on the levee line of 1854, and 36 feet 4 inches and 2 lines on the inner line of the-present wharf on the river front. The side lines of the said strip between said points extend 532 feet and 8 inches. Whatever may be the proper location of the strip in which plaintiffs have an undivided interest, the possession of the same by the city and the board of commissioners of the port has been that of administrators of a public servitude or easement. Such right of possession is given by the' same law which recognizes the ownership of riparian proprietors in batture necessary for public use. Hence the continued possession of the city of plaintiffs’ interest in the batture cannot be construed as that of owner, and therefore there is in this case no< basis for prescription acquirendi causa.. Plaintiffs could not have recovered the possession and control of their interest in batture necessary for public use, and while this condition continued no prescription ran against them. The pleas of prescription filed *168 by defendants are without merit, and are inconsistent with their contention that the locus in quo is necessary for public uses. As the city owns the batture between Lafayette and Canal streets, the exception of nonjoinder of proper parties is bad.
The property conveyed by Minor to the city in 1854 had a frontage on the battu,re of 36 feet, more or less; the starting point being dependent on the location of the line of the Mississippi river. Edgar Pilie, a competent surveyor, at the instance of plaintiffs, made a survey and plot of the locus in quo, which plot is found on page 115 of the transcript. As there is much contention as to the correctness of this plot, it is necessary to consider the data on which it was prepared. It is based primarily on a certificate signed by Louis H. Pilie, deputy city surveyor, in June, 1877, and filed in evidence in the suit of Minor v. Life Association of America (City of New Orleans, warrantor), which we have already discussed.
This certificate was offered in evidence by the original defendant in said suit for the purpose of showing the boundaries of the strip embraced in the sale from Minor to the city made in 1854. It showed that the two lots in dispute in that case were embraced in said sale, and this could only be done by establishing the river line as it existed in 1854. On the evidence furnished by this certificate, there was judgment in favor of the original defendant, which inured to the benefit of the city, and there was also judgment of nonsuit against the plaintiffs as to their claim for batture accrued since 1S54.
The said certificate reads as follows, to wit:
“This is to certify that in the year 1854, the square of ground comprised between Gravier, Front, Poydras and Delta Streets was already formed and made a part of the Levee Steamboat Landing, the outer side of the Levee being at that time a distance of seventy-three feet from the corner of Gravier and Delta Streets and at a distance of fifty-three feet from the corner of Poydras and Delta streets.”
■ This certificate was in 1877, b,y consent of parties, received in lieu of the testimony of the deputy city surveyor, who died subsequently, and, considered as the testimony of a deceased witness, was admissible in evidence in a subsequent suit between the same parties. This certificate having been used successfully in behalf of the city in the former suit, we do not think that the truth of its contents can be now questioned by the city or its successor, the board of commissioners of the port of New Orleans.
Edgar Pilie is the son of Louis H. Pilie, the former deputy city surveyor, and based the plat filed in evidence on the facts set forth in said certificate, and on the other data obtained from his father.
We assume that any competent surveyor could locate the outside edge of the levee line as it existed in 1854 by taking the distances and measuring from the street corners as given in the certificate of Louis H. Pilie. This is not disputed, but it is contended that the low-water line of the river does not correspond with the outside edge of the levee, and that usually there is a difference of from 25 to 35 feet.
The levee, so called, in front of “Steamboat Landing,” is an embankment extending to the waters of the river, and protected by a bulkhead, from which the wharf extends outwards in the stream. This has been the condition from time immemorial. Hence such bulkheads constitutes an artificial perpendicular bank of the river, against which the waters of the river beat as they rise and fall. Hence the outer edge of such levee or embankment is the same as the outer edge of the bank of the river, and must be considered as marking the water line of the stream, in the absence of evidence showing the formation of batture beyond such line, sufficiently elevated for private ownership. In this case there is no such evidence, nor any evidence showing the difference between the high-water and low-water line of the *169 river at this particular point. We cannot accept the view that the parties to the sale of 1854 intended to designate by the term “river” the line of low water, which is ever variable, and therefore not susceptible of delimitation. The certificate filed in evidence and accepted as true designated the outer edge of the levee as marking the bank of the stream.
In this state the beds of navigable streams, as long as they are covered by water, belong to the public. Civ. Code, art. 453. “The banks of a river or stream are understood to be that which contains it in its ordinary state of high water.” Oiv. Code, art. 457. Therefore, in speaking of a river as a boundary, the stream in its ordinary state of high water is intended. Otherwise the bed might belong to the public or to the riparian owner according to the rise or fall of the river.” “Sea shore is that space of land, over which the water of the sea spreads in the highest water, during the winter season.” Civ. Code. art. 451.
By a parity of reason, the line of usual high water in a navigable stream should be the line of delimitation between its bed and its banks. In Howard v. Ingersoll, 13 How. 466, 14 L. Ed. 189, the court said:
“When the commissioners used the words ‘bank’ and ‘river,’ they did so in the popular sense of both. When banks of rivers were spoken of, those boundaries were meant which contain their waters at their highest flow, and in that condition they make what.is called the ‘bed of the river.’ ”
Hehce the term “Mississippi river,” in its usual sense, includes the bed of the stream up to its ordinary state of highwater. This was the construction of the deputy city surveyor in 1877, when he adopted the outer edge of the levee embankment as the line of the river, and his work was accepted by the parties to the suit as correct.
We therefore think that the surveyor in this case properly fixed his starting point at tlie outer line of the levee of 1854. The strip surveyed has a frontage on this line of 36 feet 1 inch and 6 lines, and a frontage on the outer line of the wharf of 36 feet 4 inches and 2 lines.
There is no contention that either frontage is in excess of what is proper. The two frontages are connected by lines perpendicular to the river front. In a division of batture the course of the side lines of the abutting property are not considered. Delord’s Heirs v. City of New Orleans, 11 La. Ann. 699; Newell v. Leathers, 50 La. Ann. 162, 23 South. 243, ,69 Am. St. Rep. 395. We see no possible advantage to defendants in changing either the front or side lines, and no other imrties have any interest in the question.
The remaining contention is as to what portion of said strip of ground is necessary for public use. A reference to the plat will show that the said strip is 532 feet and 8 inches in length, representing the width of the batture at this point. On the river front is the wharf incline, and some 188 feet back a paved roadway, 30 feet wide. The evidence' shows, and it is not disputed, that the space between the inner line of said roadway and the river is necessary for the discharge, receipt, and handling of freight brought to this landing by steamboats and other vessels.
Between the paved roadway and the line of levee of 1854 is a distance of 308 feet. The plat shows that this strip is crossed by four railroad tracks. The one nearest the river is called the “L. & N. Track.” The evidence does not show that the space between the levee line of 1854 and the outer edge of the L. & N. track, is used for the purpose of the commerce of the port. It is to be noted that the corresponding space southeast is covered by the Southern Pacific Railway Depot and the tracks of that and other companies. As to the use of that portion of the strip in dispute between the L. & N. track and the “paved roadway,” for the purpose *170 of the commerce of the court, and the extent of such use and its necessity, the evidence is voluminous. We have carefully read the testimony of the witnesses on this subject, and, excluding such portions as are merely matters of opinion, find the following facts as established with a reasonable degree of certainty: Usually the space lying between the “paved roadway” and the nearest railroad track is not used for the deposit of cotton and other freight brought to the port by steamers, but is used for such purpose to a certain extent under exceptional conditions, which occur generally every season. When these conditions occur, cotton is placed on the space in question to within about 30 feet of the outside of L. & N. track. This was done when there is a congestion of cotton or other freight on the wharf proper to such an extent that more space is required for handling the same. This happens during -tlie busy cotton season, when a number of heavily laden steamers reach port about the same time. This extra-busy season lasts about three months. During the remainder of the year said space is but little used. Oapt. E. L. Cope, president of the board, admits that the use of such space is exceptional, but says:
“It is necessary when we have those exceptions to have the space necessary to accommodate the vessels.”
This witness admits that in such exceptional cases cotton is not placed nearer than 30 feet to the L. & N. track, that distance being the limit of safety from danger of fire from locomotive sparks.
The general trend of the testimony is to the effect that the commerce of the port is increasing, and that there is no space to spare on the batture. The latter, however, is a matter of opinion.
Plaintiffs’ demand that the court determine what portion of the batture is not necessary for public use is based on the provisions of section 318 of the Revised Statutes of 1870, which reads as follows, viz.:
“Whenever the riparian owner of any property in the incorporated towns or cities in this state is entitled to the right of accretion, and batture has been formed in front of his land more than is necessary for public’ use, which the corporation withholds from him, he shall have the right to institute suit against the corporation for so much of the batture as may not be necessary for public use, and if it be determined by the court that any portion of it be not necessary for public use, it shall decree that the owner is entitled to the property and shall compel the corporation to permit him to enjoy the use and ownership of such portion of it,”
In Ice Co. v. City, 43 La. Ann. 217, 9 South. 21, this court held that batture accretions in front of the city of New Orleans are enjoyed by the riparian owner subject to the right of the corporation to reserve and use a sufficient portion thereof for public uses, such as levees or streets. In that ease the court cited with approval the case of Sarpy’s Heirs v. City of New Orleans, 13 La. Ann. 349, as holding that such right of reservation included such portions of the batture “as may be needed for commerce, public highways, and streets.” It is to be noted that section 318 of the Revised Statutes of 1870 does not define the particular public uses to which batture is subjected, as did the act of 1853, p. 298, No. 333, which mentioned “the uses of commerce and navigation, and for the necessary public highways and other public uses.” Before the passage of the act of 1853, the municipal corporation had the exclusive right to determine where . and to what extent the riparian proprietors might take possession of the batture. Remy v. Municipality No. 2, 12 La. Ann. 500. As a public administrator of the batture, the city must still determine primarily what disposition shall be made of the same, subject, however, to the right of the courts to finally decide what portion is no longer necessary for public use. In such cases the presumption is in favor of official action, and the *171 burden of proof is on the riparian proprietor to show that the portion of the batture claimed by him is not necessary for public use.
Delta street was partially laid out prior to 1853, as shown by the Braun map filed by plaintiffs in the suit of Minors v. Life Association of America. Even if it had not been so laid out, we think that the city, under the act of 1853, had the right to lay out such street on the batture without compensating the riparian owners. Hence the strip claimed in this case should not be permitted to infringe on Delta street, which seems to be the case, judging from the plat before us.
We are of opinion that from the east line of Delta street to a distance of 30 feet beyond the railroad track nearest the river the strip sued for is not necessary for public use. Part of this portion of said strip is covered with railroad tracks, which shows that it is not necessary for the uses of commerce in the sense of the statute. While the city has the undoubted right to grant railroads rights of way over public streets and public places, such right cannot be exercised over a batture to the detriment of private ownership. The servitude established by law on the banks of rivers and streams is in the interest of navigation and commerce, and is confined to vessels and other water craft. Oiv. Code, art. 455.
We have considered the photographs filed in evidence, which show that on a number of days in December and January there was little or no freight on the space between the outer railroad track and the paved roadway. But considering all the evidence together, we are not prepared to say that a large portion of such space is not necessary for public uses. The evidence shows that it is necessary every season, when certain conditions concur. This evidence is accentuated by the fact that it has been left open for public use ever since the batture was formed, and all the witnesses familiar with the situation concur in the view that such space is essential to the increasing commerce of the port. It was argued that space could be economized by different methods of handling cotton, but we think that this is a matter of administration which should be left to the board of commissioners of the port.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and it is further ordered and decreed that the plaintiffs herein be recognized as the owners of one undivided fourth interest in the strip sued for, and, as such, entitled to the possession of one undivided fourth interest in and to all that portion of the strip of ground colored in yellow on the plat of Edgar Pilie, filed in evidence, lying between the east line of Delta street and a line to be drawn across said strip at a distance of 30 feet beyond the railroad track nearest to the river; and it is further ordered that the defendants pay all the costs of this suit.