Statement of the Case.
MONROE, J.
This is an expropriation proceeding, in which the plaintiff has appealed, asking that the amount awarded be reduced, and the defendant has answered, asking for an additional allowance. The only questions presented are as to the value of the property and the fact and quantum of damages. Defendant owns a plantation of about 1,000 acres, situated some two miles above Baton Rouge and having a frontage of say a mile on the Mississippi river. At a distance varying from say 600 to 1,800 feet from *455 the river there is a bluff, and between the bluff and the river there is a batture, more or less wooded, subject to overflow in high water, and available, in ordinary stages of the river, for the purposes of pasturage, but not much used for the making of crops. The river, in front, has a depth of 40 feet or more (near the hank), and by reason of the configuration immecLiately above there is slack water, which makes the place a good harbor for flatboats, barges, and rafts, though it does not appear that defendant has hitherto derived any particular revenue from that source. The estate was, however, owned by his father, and whether for that reason, or because he believed that its advantages would, some time or another, he appreciated, he has held and paid the taxes on it for a period equaling that required for the passing of a generation. Considering the matter from a business point of view, his experience seems to verify the proverb that “all things come to those who wait”; for, whilst the plantation, when he acquired it, was so remote from the business centers of the country that few sensations reached it from those sources, it has, within the past few years, been connected with the outside world by railroads running to the four points of the compass, and has established, within its own boundaries, a city in embryo, with city lots, streets, sidewalks, and (it is to be hoped) proper sanitary regulations.
In 1905, the Yazoo & Mississippi Valley Railroad Company (one of the components of the Illinois Central System), having built a road running north and south, through the property, acquired the entire batture of the plantation below, which is separated from that of defendant by a tract some 800 feet in width, and established on the river bank the necessary facilities for the ferrying of cars to and from the trans-Mississippi territory. The Colorado Southern Railroad Company, coming from the west, reached the bank of the river at a point about opposite the lower end of defendant’s plantation, and there established similar facilities. And it is said in one of the briefs that each of the companies mentioned was to handle the traffic of the other, but that they disagreed (and the records of this court show that fact), with the result that the one has no landing on the one bank, and the other none on the other bank, and that the Yazoo & Mississippi Valley Company is now waiting for the Southern Pacific to come to the west bank of the river, whilst the Colorado Southern, representing the Rock Island and Frisco Systems, is waiting for plaintiff to get to the bank upon this side. These last-mentioned facts, or theories, are not disclosed by the evidence in the record; but it is shown that the Yazoo & Mississippi Valley Company acquired the batture (and some high land) and built the “incline” as stated. It is also shown that the Colorado Southern has come to the other side of the river, and there built an “incline.” It is further shown that plaintiff is the owner of a road, built by its predecessors (possibly three years ago), which runs north and south through defendant’s plantation, at a distance of say three-quarters of a mile to the eastward of that of the Yazoo & Mississippi Valley Company, and that it now desires to acquire a certain strip, or irregular parcel, of land forming part of the plantation, in order to enable it to reach the river bank and there build an “incline” on this side of the river. Hence this suit.
Opinion.
The particular parcel which is sought to be expropriated is said to contain 49.7 acres and runs across the plantation, from plain tiff’s road (on the east) to the river (on the west), a distance of say a mile, and then turns northward and runs up the bank of the river for half a mile or more; our understanding of the delimitation of the parcel in question being attempted in the shaded figure “1, 2, 3” on the subjoined sketch, which *459 has been reduced (more or less inaccurately) from one of several plats offered in evidence.

*457

*459 Defendant acquiesces in the expropriation, but alleges that he ought to be paid at the rate of $700 per acre for the high land that plaintiff proposes to take, and at the rate of $340 per acre for the batture; that, by crossing the batture near the lower end and building its embankment near the water’s edge, upstream, plaintiff will pocket, or render inaccessible, all the land between the embankment and the bluff (represented on the sketch by letter A); that by extending its piling, as it proposes to do, in front of the bank, downstream, it will blanket, or shut in, 15 acres (represented on the sketch by letter B), which will be behind the piling; that 19 acres, lying immediately below the 15 acres mentioned, will be depreciated in value to the extent of $S5 per acre. Wherefore he prays judgment for various sums, which are said to amount in the aggregate to $49,133. (There are, we think, some errors in the figures stated in the petition; but, as they will be lost in the general' result, they need not be further referred to.). Plaintiff placed on the stand its assistant president, Mr. Ellerbe; its roadmaster, Mr. Mee; its secretary, and general superintendent, Mr. Helm; its president, Mr. Edenborn; Mr. Woodside, the parish assessor; Mr. J. C. Hamilton, a citizen of Baton Rouge, engaged in the oil business ; Mr. B. R. Mayer, who has been in the grocery business; Mr. Gottlieb, a banker; Mr. R. J. Hummel, a real estate dealer and expert; and Mr. E. A. I-Iebert, wharfmaster. On behalf of defendant, there were called Mr. Swart, a civil engineer; Mr. Dozier, president of the Standard Box Company (whose property, near the river, is indicated on the sketch); Mr. Steele, State Treasurer, and an old resident of Baton Rouge; Mr. Webb, president, of the Peed Company (whose property, on the river, is indicated on the sketch); C’apt. Robert Cothell, owner of the property marked (on the sketch) “Ship Yard”; Mr. K. H. Knox, defendant’s son; and defendant himself, both of them being lifelong residents of Baton Rouge and owners of property. There were offered in evidence, on one side or the other, a number of acts of sale, assessment rolls, plats, blue prints, etc., and the jury, accompanied by counsel, visited the property, after which (and the argument and the charge) they brought in a verdict1 in favor of plaintiff, on the question of expropriation, and assessed the property to be taken at $275 per acre, or a total of $13,667.50, to which they added $2,890 as damages. Some idea of the difference of opinion among the witnesses may be gathered from the fact that Mr. Ellerbe, plaintiff’s assistant president, referring to the batture land, said, “I should say that the stuff is worth about $25 an acre,” and he considered an offer of $100 an acre, all around, a liberal one. Capt. Cothell, on the other hand, who owns the “Ship Yard” (3% acres), values it at $2,000 an acre, and does not care to sell at that price; and he thinks that defendant’s batture ought to be worth from $500 to $1,000 an acre. Mr. Dozier, acting for the box factory, paid $750 an acre for 18 acres (lot B), behind the batture, some two or three years ago, and his company paid $7,000, in 1902 or 1903, for the 3% acres in lot P on the river bank. Referring to defendants’ property, he says:
“I consider the land, as a whole, very valuable property, for commercial purposes.”
Mr. Webb testifies that he bought the 34.81 acres, contained in the Peed Company tract, with a sugar factory and machinery on it, at forced sale and within the past few years, for $70,000; that the buildings were of little or no value, that the machinery was valued at $20,000, and that the value of the land, as represented in the purchase, was something over $1,400 an acre. Plaintiff’s witness, Mr. Hummel, who was the only real estate deal *461 er and expert who was examined, testified that he bought the tract immediately adjoining defendant’s property (marked G and Gl, Standard Oil) seven years before at $40 per acre, and sold it to a Mr. Towl, on February 20, 1909, at $225 an acre; and, it appearing that Mr. Towl was acting for the Standard Oil Company, and that the purpose was to establish a refinery plant at a cost of a million or two of dollars, and the witness being interrogated in regard to his information on that subject at the time that he made the sale, he said:
‘‘Previous to the Standard Oil Company making their announcement Lwhich was some time in April, and after the institution of this suit] I had no knowledge as to who purchased the l>roperty.”
And he further testified as follows:
“Q. What, in your judgment, is the effect of the erection of a plant such as you have described on land adjacent to the same?' A. Very great. Q. In favor or against? A. In favor of surrounding property. Q. The arrival of this industry has increased the value of property? A. Since they have announced their plans, yes, sir; they have increased.”
The increase to which he refers is further evidenced by the fact that, two weeks before this case was tried, defendant’s son, who is assisting him in the management of his affairs, laid off a small tract of his land (indicated on the sketch as “Suburb Monteseno”) in lots (30x135), with streets and alleys, and sold them almost as fast as they were offered at from $175 to $225 per lot, increasing the price by $50 per lot after the first 20 had been sold, and realizing, after deducting cost of survey, paving, etc., $750 per acre. I-Ie (or defendant) then, in order to make the suburb accessible, bought a strip of land from Squires and Gowe (whose property is indicated on the sketch) running across the rear ends of their tracts to the “Suburb Dixie,” at the rate of $1,250 per acre.’ Long prior to those occurrences, however (in 1905), the Xazoo & Mississippi Valley Company had bought the land upon wnieh its “incline” is built, together with the tract of upland marked “G2, Standard Oil,” 213 acres in all, and had paid for them $53,253 cash, being a trifle over $250 an acre.
For these reasons,' and others which might be stated, we think defendant’s land is worth more than plaintiff is disposed to pay for it, and we are inclined to concur with those witnesses who say (and there are several of them) that the value of that which is not actually to be taken will not be enhanced by being cut off, or measurably cut off, from the river. The entire question is, however, very much a matter of opinion, and we are not at all confident that any opinion that we might entertain would come nearer being sustained by future events than that which has been expressed in the verdict of the jury. The most that we can say is that the verdict does not appear to us to be unreasonable.
The verdict and judgment appealed from are, accordingly, affirmed.