(62 South. 157.)

No. 19,428.

WARRINER et al. v. BOARD OF COM'RS OF PORT OF NEW ORLEANS et al.

(May 12, 1913.)

*(Syllabus by the Court.)*

1. NAVIGABLE WATERS (§ 44*) — BATTURE — PUBLIC USE.

In the city of New Orleans the levee constitutes the banks of the Mississippi river, and all the batture in front of said levee is dedicated to public use in the interest of commerce and navigation in their broadest sense.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–278, 281, 282; Dec. Dig. § 44.*]

2. NAVIGABLE WATERS (§ 44*) — BATTURE — OWNERSHIP.

The owner of real estate abutting the levee holds the naked title to the banks of the river, but has no property rights in the use of the batture, and cannot take possession of or use the same in any manner, without the permission of the municipal authorities, unless authorized by the judgment of a competent court.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–278, 281, 282; Dec. Dig. § 44.*]

3. NAVIGABLE WATERS (§ 33*) — BATTURE — CONSTRUCTION OF ROADWAY—RIGHT TO INJUNCTION.

The plaintiffs, representing a riparian proprietor, have no right to injoin the board of commissioners of the port of New Orleans from constructing a roadway for freight cars and vehicles across the batture at and near Soniat street, lying between the crown of the levee and the waters of the river.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 179; Dec. Dig. § 33.*]

4. WHARVES (§ 5*)—DOCK BOARD—POWERS.

The said board, under the statutes of its creation, has plenary power to construct wharves and landings, roadways, and all other improvements and modern facilities for the purpose of maintaining and developing the commerce of the port of New Orleans.

[Ed. Note.—For other cases, see Wharves, Dec. Dig. § 5.*]

5. NAVIGABLE WATERS (§ 33*) — BATTURE — CONSTRUCTION OF ROADWAY—RIGHT TO INJUNCTION.

Plaintiff, without present beneficial interest in the batture, has no standing to complain that said board is constructing a railroad across the same for the purpose of transporting lumber and other freight in car load lots to the wharves on the river front for shipment.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 179; Dec. Dig. § 33.*]

6. WHARVES (§ 12*)—DOCK BOARD—DISCRETIONARY POWER.

Under the statutes the particular modes of transporting freight over roadways leading to the wharves is left to the sound judgment and discretion of the board of commissioners of the port of New Orleans.

[Ed. Note.—For other cases, see Wharves, Dec. Dig. § 12.*]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Matthew Warriner and others against the Board of Commissioners of the Port of New Orleans and others. From judgments for defendants, plaintiffs appeal. Affirmed.

Hall, Monroe & Lemann, Dart, Kernan & Dart, F. E. Rainold, Dinkelspiel, Hart & Davey, J. J. McLoughlin, and J. C. Henriques, all of New Orleans, for appellants. James Wilkinson, of New Orleans, for appellee Board of Com'rs for Port of New Orleans. I. D. Moore, City Atty., and John F. C. Waldo, Asst. City Atty., both of New Orleans, for appellee City of New Orleans.

LAND, J. Plaintiff sought to enjoin the defendants from constructing and operating a railroad track on batture alleged to belong to the plaintiffs, and "practically" above the high-water mark of the Mississippi river. The defendants are the board of commissioners of the port of New Orleans (hereinafter called the dock board), the Public Belt Railroad Commission of the city of New Orleans (hereinafter called the Belt Railway), and the city of New Orleans. The defendants, in substance, answered that the locus in quo formed a part of the banks of the Mississippi river, was far below the usual high-water mark, and was subject to public servitudes in aid of navigation, commerce, highways, and levees. The dock board averred that the contemplated railroad trestle was for the benefit of the commerce of the port of New Orleans, and was a necessary adjunct to the wharves and sheds erected by said board for the purpose of handling freight. There was judgment in favor of the defendants, and the plaintiff has appealed.

The strip of ground in controversy lies between the crown of the public levee at Soniat street and a line of wharves in the river erected by the dock board for the benefit of the commerce of the port of New Orleans. In order to connect the line of wharves with the Belt Railway, the dock board ordered the construction of a switch track in accordance with plans recommended by its engineers. This switch track, leaving the track of the Belt Railway below Soniat street, enters and leaves said street by two curves, and infringes on the batture claimed by the plaintiffs as the private property of the Jefferson Saw Mill Company.

The contention of the plaintiff is that the proposed switch is for the sole use and benefit of the Belt Railway, and that the batture in question is not subject to a servitude for railroad purposes. This contention is based on the case of Minor's Heirs v. City of New Orleans, 115 La. 301, 38 South. 999, where the plaintiffs instituted suit under section 318 of the Revised Statutes of 1870 to recover a portion of the batture as no longer necessary for the purposes of navigation, commerce, and other public uses. The court found that a certain portion of the batture, on which there were several railroad tracks, was not necessary for public purposes, and held that there was no public servitude over such batture in favor of the railroads. The ground in dispute in that case had ceased to

be batture, and was several hundred feet behind the levee. The railroads using the tracks were ordinary commercial lines.

In the case at bar the ground in dispute is batture in process of formation. A part of it is permanently covered with water, and the remainder is subject to periodical overflow. The river front is covered by the wharves and sheds of the dock board. The railroad complained of by the plaintiffs is an elevated switch track intended principally for the transportation of freight in car load lots to and from the wharf on the river front. All the wharves have similar switches connecting with the Belt Railway. The situation and conditions at Soniat street are shown in the following extracts from the testimony of Mr. McCloskey, president of the dock board, to wit:

"Q. Suppose you had no trestle or railroad to reach at that point, what would be the result?

"A. You could only reach it by river. You cannot handle bulk cargo that is for export and carry it from the railroad depots there, unless at a prohibitory expense.

"Q. Suppose you used drayage?

"A. That would be impracticable, as far as expense is concerned; the cost of handling a bale of cotton or a load of lumber would be such that you wouldn't have any business at that wharf.

"Q. Then the lumber wharf you have built with this trestle approach is necessary for the commerce of the port, you say, and that is the judgment of the commission?

"A. Not only the judgment of the dock board, but the legislative commission, that was appointed for the purpose of investigating conditions, reported the necessity of a lumber wharf being built."

Mr. Thompson of the Belt Railway, in reply to a question as to the connection between the dock board and the elevated switch in question, said:

"It has a material connection * * * because they cannot operate the wharf unless they have such access. The dock board, in building this trestle, is doing exactly the same that it would be doing in another way if it filled in behind and the Belt ran over it. The dock board is simply constructing some method of access by which its wharf will be useful, and otherwise not."

The wharf is in the bed of the river, and the construction of a trestle was necessary to reach it. The trestle in question was intended as a roadway for vehicles as well as railroad cars.

[1, 2] Article 455 of the Civil Code declares that:

"The use of the banks of navigable rivers or streams is public." •

And article 457 provides that:

"On the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks."

Article 863 of the Civil Code reads as follows:

"The corporations of cities, towns and other places may construct on the public places, in the beds of rivers and on their banks, all buildings and other works which may be necessary for public utility, for the mooring of vessels and the discharge of their cargoes, within the extent of their respective limits."

The preservation of the banks of navigable streams for public use is in the interest of commerce, the erection of public levees, and the construction of public roads. The articles above mentioned were taken from the Civil Code of 1825. They were construed in the case of Pulley & Irwin v. Municipality No. 2, 18 La. 278, decided in the year 1841. In that case the plaintiffs, riparian proprietors, who had taken possession of the batture between the public levee and the river, and erected a levee and other improvements thereon, sued the defendant for damages for removing large quantities of earth from said batture, and sought to enjoin the defendant from further trespass on his alleged property. The Supreme Court rendered judgment in favor of the municipality. The court, referring to article 859 (now 863), said:

"We think, in reference to this article and several others, relating to the uses stated, that they confer plenary powers, and should be liberally construed, when the whole community is to be benefited and an individual injured no further than being deprived of such profits as he supposed he could have made. It may be fur-

ther remarked that the expression for the mooring of vessels, spreading nets, building cabins, etc., used in the Code, whilst they are permissive for those purposes, are not intended as restrictions of the use to those purposes alone, but as examples or illustrations of its application. The public is a great usufructuary, the corporation is the administrator, and is not restricted to a mere right of way over the batture or the bank, or to keeping it for the special use of the owner. They have a right to all the profit, utility, and advantages it may produce, and can make works and improvements to increase the revenues."

Under the doctrine thus announced, the city of New Orleans could remove the batture claimed by the plaintiffs and use the dirt for filling the bed of the river, the construction of levees, or other public works on the river front.

By Act No. 333 of 1853 the right was given to any riparian owner of property in incorporated towns and cities to institute suit against the municipality for so much of the batture as may not be necessary for the use of commerce and navigation and for the necessary public highways and other public uses. Under this act it was left for the court to determine what portion of the batture was not necessary for the public uses above mentioned. This act was, in substance, incorporated in the Revised Statutes of 1870; the only difference being the omission of the enumeration of public uses. See Id. § 318. The suit of Minor's heirs, supra, was brought under this section, and the court determined what portion of the batture claimed was not necessary for public use. In that case, however, the court, while awarding a portion of the batture to the plaintiffs, refused to recognize their claim to a street laid out on the batture by the city of New Orleans. Minor's Heirs v. City of New Orleans, 115 La. 315, 38 South. 999.

[3, 5] Plaintiffs have not availed themselves of the same statutory remedy, but merely seek to injoin the defendants from erecting a railroad trestle on the batture. As long as the batture is subject to public use, there can be no right of possession in the riparian owner, holding the naked legal title to the property. With no rights of "usus" and "fructus," how can the plaintiff be damaged by the construction of the trestle in question? In the case of Sweeney v. Mayor et al., 42 La. Ann. 614, 7 South. 729, 21 Am. St. Rep. 400, it was expressly decided that the riparian owner had no property in the *use* of the banks of the Mississippi river; and the court cited Watson v. Turnbull, 34 La. Ann. 857, as follows:

"Within the corporate limits, the city of New Orleans, under her charter and under the general law, has the right to control, manage, and administer the use of the river banks for the public convenience and utility, to establish wharves and landings, to erect works and provide facilities for the use of vessels and water crafts, and to charge just compensation for the use thereof. Riparian proprietors have no right to appropriate to their exclusive use these banks, and they have no private property in the use thereof, which is public. The discretion of the city authorities in determining what are proper and needed facilities for commerce, and on what part of the river bank, within her limits, they should be established, is manifestly not a proper subject for judicial control or interference. Whatever incidental damage may result to proprietors from the exercise of these unquestionable corporate rights, it is damnum absque injuria."

[4, 6] The dock board has the power to regulate the commerce and traffic of the port and harbor of New Orleans in such manner as may, in their judgment, be best for its maintenance and development. They have the power, and it is their duty, to take charge of and administer the public wharves and landings of the port of New Orleans, to construct new wharves where necessary, and to erect sheds on the wharves to protect merchandise in transit, to place and keep the wharves and landings in good condition, maintain sufficient depth of water, and to provide for lighting and policing such wharves, sheds, and landings, etc. See Act No. 70 of 1896, amended by Act 36 of 1900. The preamble of Act 70 of 1896 shows that the dock board was expected to "operate and

improve the wharves and other terminal facilities of the port and greatly develop and expand its commerce by removing many of the obstacles now placed in the way of its advancement." Act 44 of 1904 authorized the dock board to issue and negotiate $2,000,000 of bonds. The preamble of the act reads in part as follows:

"Whereas, it is necessary to the commerce of the port of New Orleans, that modern facilities be afforded vessels visiting the port, that the entire wharf system received from the lessees be entirely rebuilt, and that sheds and roadways be constructed, and suitable dredge and tug boats be secured; and other facilities provided," etc.

Section 7 of the act provides that the funds received from the sale of the bonds should be used "for the payment of the cost of constructing wharves, sheds, roadways," etc. The act of 1904 contemplated that the dock board should use modern and up-to-date facilities in handling the traffic of the port, and roadways were specially included among these facilities. The modern method of handling freight in car load lots intended for export is by means of railroad switches and tracks on the wharves. The evidence shows that the cost of unloading such freight and hauling it by teams to the wharf would be prohibitive. The wharf from Soniat to Valence streets, 2,400 feet in length, was constructed for the special purpose of shipping lumber and other products of the forest. The dock board had full authority to construct a roadway for the purpose of conveying such freight to the wharf, and the particular mode of conveyance was left to the discretion of the board. As far as the use of a roadway is concerned, there is no essential difference between a conveyance propelled by steam and one drawn by horse or mule power. They are merely different modes of using the roadway.

The switch in question was absolutely necessary for the shipment of lumber, logs, timber, etc., in car load lots. The allegation that the switch was for the sole use and benefit of the Belt Railway is repelled by the evidence. That the Belt Railway will derive some benefits from the switch is immaterial. The Belt Railway itself is a great public utility, operated by the city of New Orleans, in the interest of the commerce of the port. The wharves would be comparatively useless without the services rendered by the Belt Railway.

The roadway in question was authorized by all the constituted authorities having jurisdiction over the locus in quo and the plaintiff, *without any present beneficial interest in the batture*, has no standing to complain of the action of the dock board in a matter of administration within its jurisdiction. The question of roadways to and from the wharves, and the particular modes of transportation of freight over the same, is left to the sound judgment and discretion of the dock board.

It is therefore ordered that the judgment below be affirmed, and that plaintiffs pay the costs of appeal.