621 So.2d 602 (1993)
Warren DeSAMBOURG and Mary DeSambourg
v.
BOARD OF COMMISSIONERS FOR the GRAND PRAIRIE LEVEE DISTRICT.
No. 93-C-0167.
Supreme Court of Louisiana.
July 2, 1993.
Rehearing Denied September 2, 1993.
*603 Mack E. Barham, Robert E. Arceneaux, and Matthew K. Brown, Barham & Arceneaux, for applicant.
Jack P. Brook, Norman F. Pizza, and Michael A. Stroud, Brook, Morial, Cassibry & Pizza, for respondent.
ORTIQUE, Justice[1].
We granted writ to determine the meaning of "batture" as it is used in the context of the batture exemption from compensation for the state's appropriation of riparian lands pursuant to its levee servitude.[2] Riparian landowners at Shingle *604 Point filed eleven suits, which have been consolidated, against the Board of Commissioners for the Grand Prairie Levee District, now Plaquemines Parish Government ("PPG")[3] claiming fill dirt was appropriated from their lands without compensation. PPG denies liability claiming the landowners are not entitled to compensation because the appropriated fill dirt was batture taken for levee purposes and, therefore, exempt from compensation pursuant to LSA-Const. Art. 6, § 42 and LSA-R.S. 38:301(C)(1)(a). After a bench trial on the merits, the court determined all of Shingle Point is batture, found no compensation is due for the taking of the batture, and dismissed plaintiffs' suits. The court of appeal affirmed. 608 So.2d 1100 (La.App. 4th Cir.1992). In the context of the batture exemption from compensation, "batture" is alluvial accretions annually covered by "ordinary high water," the highest stage the river can be expected to reach annually in seasons of high water. Applying that precept to the factual findings of the trial court, we find no error in its conclusion that all of the land taken by PPG, pursuant to its levee servitude, was batture within the meaning of the constitutional exemption from compensation and, therefore, exempt from the payment of compensation.

I.
Shingle Point, near English Turn in Plaquemines Parish, is an area of approximately fifty acres. It lies between the Mississippi River and the levee on the river's left descending bank at River Mile 78. When the river is at its ordinary low stage, the distance between the toe of the levee and the water's edge is about 900 feet. It is wooded and composed of alluvion. Its artificial levee is 18.0 feet or more high and topped with concrete upwards from 8.3 feet. Borrow pits[4] had previously been excavated in the area. These consolidated suits concern borrow pit excavations for two levee projects involving approximately sixteen acres of Shingle Point.
The two levee improvement projects were initiated and supervised by the United States Army Corps of Engineers ("COE"). The COE specified the locations of the levee projects and the areas to be appropriated, including the appropriation of portions of Shingle Point for borrow pits.[5] Accordingly, in 1982 and 1983, a six acre area at the southern end of Shingle Point was appropriated by Plaquemines Parish Commission Council for the Grand Prairie Levee District for the Scarsdale-Stella Levee Set Back and Road Relocation Project, a project 2.1 miles from the borrow pit site. An additional ten acre area of Shingle Point was appropriated for excavation *605 in 1986 through 1988 for the English Turn Levee Enlargement and Concrete Slope Pavement Project, a project adjacent to the borrow pit site. Both excavations involved the clearing of shrubs and trees and the removal of fill dirt or borrow material. The pit was located 100 feet from the toe of the levee and extended 700 feet across.
Plaintiffs Warren and Mary DeSambourg, Albert and Rosalie Schell, Sadie, Joseph, JoAnn and Linda Perino, Charles and Angelina Mancuso, and Mary and Joseph Seibert, Jr., filed their suits in July and August, 1984, seeking damages for the fair market value of the property taken for the Scarsdale project, severance damages and attorneys fees. Plaintiffs Anthony and Marie LaGreco, Joseph LaGreco, Emile LaGreco, Salvadore DiCarlo, Henry Heier and Charles and Ina Miller, filed their suits in 1987 seeking damages for the fair market value of the property taken for the English Turn Project, severance damages and attorney's fees.
PPG filed a motion for summary judgment, claiming all the property appropriated is batture and exempt from compensation. The trial court referred the motion to trial on the merits. At trial, after the plaintiffs presented their evidence and rested, the court granted summary judgment in the suit of Charles and Ina Miller because the levee servitude appropriated was not utilized, as borrow was not taken from their property. Since the property appropriated was not "actually used, damaged or destroyed" as is required by LSA-R.S. 38:281(B), as amended by Acts of 1979, No. 676, the trial court found the Millers had no basis for claiming compensation. The judgment against the Millers, dismissing their suit, is now final.
Trial continued in the remaining ten suits to determine whether the appropriated lands were batture. The trial court adopted the definition of batture used in Boyce Cottonseed Oil Mfg. Co. v. Board of Comm'rs, 160 La. 727, 107 So. 506, 508 (1926), on org & reh'g, that "batture is that part of the river bed which is uncovered at the time of low water, but is covered annually at time of ordinary high water; when it ceases to be covered at the time of ordinary high water, it ceases to be batture and becomes the bank of the river." To implement that definition, the trial court relied upon Wemple v. Eastham, 150 La. 247, 90 So. 637, 638 (1922), which declared that the "ordinary high water stage" is the "highest stage that it (the river) usually reaches at any one season of the year."
In finding for PPG and dismissing the ten suits, the trial court rejected the plaintiffs' theory that ordinary high water stage is determined by examining the physical characteristics of the bank, and where physical characteristics are not clearly identifiable, by examining the types of vegetation which exist in a hydrographic environment. Instead, the trial court acceded to PPG's theory that the upper boundary of batture is the equivalent of mean high water and is determined by reviewing the statistics on the elevations the river usually reaches annually over a sufficient period of time. Utilizing that test, which it found satisfies the terms "ordinary" and "annually," the trial court calculated the mean high water at 11.0 feet, determined that Shingle Point is 97% inundated when the water reaches that stage, and concluded that all of Shingle Point is batture and subject to the constitutional and statutory exemption from compensation. The trial court accorded its conclusion with an on-site inspection of Shingle Point on March 22, 1991, when the river was at the 8.5 feet level, observing that "with the exception of a few high spots on the upriver portion, water covered the area with only the tops of trees rising above the waters."
The court of appeal affirmed. DeSambourg v. Board of Comm'rs for Grand Prairie Levee Dist., 608 So.2d 1100 (La. App. 4th Cir.1992). It found no error in the trial court's conclusion that all of Shingle Point was batture, noting the record supported the findings that, on the average, the highest point the river reaches at Shingle Point in any given year is approximately 11.0 feet and 97 to 99% of the surface of Shingle Point is inundated when the river reaches 11.0 feet, the areas not inundated being isolated spots created by man-made activity. 608 So.2d at 1108.
*606 We granted certiorari, 614 So.2d 69 (La. 1993), to determine the meaning of "batture" as it is used in the context of the batture exemption from compensation when the state appropriates riparian land while exercising its levee servitude.

II.
The constitutional guarantee that property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit, does not apply to the taking or appropriation of property pursuant to the levee servitude. LSA-Const. Art. 1, § 4[6]; LSA-Const. Art. 6, § 42[7]. This "levee servitude" exception does not offend the Fifth and Fourteenth Amendments to the United States Constitution when the servitude is administered impartially since title to riparian lands have been burdened with the legal servitude for levee and road use from the time those lands were separated from the public domain. General Box Co. v. United States, 351 U.S. 159, 76 S.Ct. 728, 100 L.Ed. 1055 (1956), reh'g den., 351 U.S. 990, 76 S.Ct. 1044, 100 L.Ed. 1502 (1956); Eldridge v. Trezevant, 160 U.S. 452, 16 S.Ct. 345, 40 L.Ed. 490 (1896). See also Delaune v. Board of Comm'rs, 230 La. 117, 87 So.2d 749, 751 (1956); Dickson v. Board of Comm'rs of Caddo Levee Dist., 210 La. 121, 26 So.2d 474, 478 (1946); State v. Richardson, 140 La. 329, 72 So. 984, 989-990 (1916); A.N. Yiannopoulos, 2 La.Civil Law Treatise 3d (1991) §§ 86, 88.
From the earliest Colonial days, when the Louisiana Territory was in the possession of France and Spain, no grants of lands were ever given without a specific reservation being made therein for the common use of the public of all rights to the shores of rivers and bayous upon which they might front. These two countries never divested themselves of title to lands lying immediately adjacent to navigable streams. This policy during the Spanish occupation of the territory, became merged with the law relative to servitudes to be found in the ancient Las Siete Partidas of Spain and, in time, found its way into the First Civil Code adopted by the Territory of Orleans (comprising what is now known as the State of Louisiana) in 1805, after the Louisiana Territory had been acquired by the United States, the basic principles relative to servitudes in Las Siete Partidas being included therein almost verbatim, thus insuring that the shores of navigable rivers and streams in this state would always be kept free for the public for levee and other public purposes. Dickson v. Board of Comm'rs of Caddo Levee Dist., 210 La. 121, 26 So.2d 474, 478 (1946).
In Louisiana, title to riparian lands fronting on navigable rivers is subject to the superior right of the public's legal servitude for the making and repairing of levees, roads and other public and common works[8]. See Delaune v. Board of *607 Comm'rs, supra; Pruyn v. Nelson Bros., 180 La. 760, 157 So. 585 (1934); Mayer v. Board of Comm'rs for Caddo Levee Dist., 177 La. 1119, 150 So. 295 (1933); Dubose v. Levee Comm'rs, 11 La.Ann. 165 (1856); 2 La.Civil Law Treatise § 88. This legal servitude for levees and levee purposes has been maintained through the transitions of the Civil Code. See La.Civil Code of 1808, art. 13; La.Civil Code of 1825, art. 661; La.Civil Code of 1870, art. 661, and LSA-C.C. art. 665 (1977)[9]. It applies to those lands that were riparian when separated from the public domain, and when the levee is necessary for the control of flood waters from the river to which the land taken is riparian. Delaune v. Board of Comm'rs, supra; A.K. Roy, Inc. v. Board of Comm'rs for the Pontchartrain Levee Dist., 237 La. 541, 111 So.2d 765 (1959). See Comment, Levees and Batture in Louisiana, 21 Tul.L.Rev. 649, 651 (1947).
Louisiana's sovereign settlers perceived that the riparian lands which fronted on rivers or streams were of little or no value if the arable soil was not protected from overflow and inundation. Dickson v. Board of Comm'rs of Caddo Levee Dist., 26 So.2d at 478. Therefore, inserted in the original land grants from the sovereign governments was the onerous levee obligation, requiring the land proprietor to build levees on the riparian lands and to keep them in repair. Id., 26 So.2d at 478 ["in 1743 an ordinance commanded planters along the Mississippi to make their levees safe under penalty of the forfeiture of these lands to the Crown"]; Zenor v. Parish of Concordia, 7 La.Ann. 150 (1852); Wolfe, Richard P., The Appropriation of Property for Levees: A Louisiana Study in Taking Without Just Compensation, 40 Tul.L.Rev. 233, 247-248 (1966); 21 Tul. L.Rev. at 649. The original theory was the riparian proprietor should bear the burden and expense of protecting all people and their possessions from annual inundations. Dickson v. Board of Comm'rs of Caddo Levee Dist., supra. Cf. 2 La.Civil Law Treatise § 88; 40 Tul.L.Rev. at 334-335; See also 21 Tul.L.Rev. at 649. This theory continued even after the purchase of the Louisiana Territory by the United States, as riparian proprietors were obligated to construct levees at their own expense, and a right of action was created in favor of neighboring landowners whose property was damaged because of the proprietor's failure to maintain the levee, with the proprietor's riparian lands being liable in rem for the cost of construction of a proper levee and with the proprietor being criminally responsible for the violation. Act of March 18, 1816, La.Acts 2d Sess. 1816, at 106 et seq; 40 Tul.L.Rev. at 334-335.
By the mid nineteenth century, governmental philosophy and public practice changed. The onerous levee obligation ceased falling solely on the shoulders of the riparian landowners. Dickson v. Board of Comm'rs of Caddo Levee Dist., supra. The necessity of an efficient and unified plan to protect the entire state from inundation was apparent. Comment, Civil Law PropertyLevee ServitudeCivil Code Article 665, 27 La.L.Rev. 321, 328 (1967). The first levee district was created in 1852. Since 1878, the construction, maintenance and supervision of Louisiana's levee system has been entirely a function of government. Id.; 27 La.L.Rev. at 327. Cf. 2 La.Civil Law Treatise § 88, p. 189; 40 Tul.L.Rev. at 233; 21 Tul.L.Rev. at 649.
Despite the changed philosophy that the riparian landowner is not solely responsible for levee obligations, the philosophical change did not alter the reservation in title of the state's levee servitude and the state's right to appropriate riparian lands. Dickson v. Board of Comm'rs of Caddo Levee Dist., supra. After the state assumed responsibility for levees, no right of action for compensation existed for lands appropriated pursuant to the levee servitude until Acts of 1892, No. 41 and Acts of *608 1894, No. 25 of the General Assembly and the Louisiana Constitution of 1898[10] imposed the requirement that the Orleans Levee Board provide compensation for appropriated lands.[11]Boyce Cottonseed Oil Mfg. Co. v. Board of Comm'rs of Red River, Atchafalaya & Bayou Boeuf Levee Dist., 106 La. 727, 107 So. 506 (1926). The Louisiana Constitution of 1921 extended the right of compensation statewide. La. Const. of 1921, Art. 16, § 6[12]. The compensation, however, was considered a "mere gratuity." Delaune v. Board of Comm'rs, 87 So.2d at 753; Pruyn v. Nelson Bros., supra. Yet, both constitutions adhered to the axiom that no compensation was owed for the taking of batture. See Pruyn v. Nelson Bros., supra.
The Louisiana Constitution of 1974 recognized and reaffirmed the levee servitude as a constitutional, legal servitude. See LSA-Const. Art. 6, §§ 38-42. Admittedly, the new Constitution altered the measure of the riparian landowner's compensation from the property's "assessed value for the proceeding year" to providing that for "lands and improvements ... actually used or destroyed for levees or levee drainage purposes [compensation] shall be paid as provided by law."[13] LSA-Const. Art. 6, § 42(A). Nevertheless, it steadfastly maintained the batture exemption from compensation. Id. See Transcript, La. Const. Convention of 1973, Vol. VIII, pp. 1604-1609 (10/4/73) and 2203-22 (11/08/73).
Implementing the 1974 constitutional provision, the legislature increased compensation from "assessed value" to "fair market value to the full extent of the loss" for the actual taking of improvements and all lands "exclusive of batture." (emphasis added) See LSA-R.S. 38:301, as amended by Acts of 1985, No: 785[14]. See also Acts of 1978, No. 314 and Acts of 1979, No. 676[15]. Thus, while significant changes occurred *609 in compensating riparian landowners for lands and improvements appropriated pursuant to the levee servitude, the batture exemption from compensation remained constant. See La. Const. of 1898, Art. 312; La. Const. of 1921, Art. 16, § 6; La. Const. of 1974, Art. 6, § 42.[16]
Although the Louisiana Constitution of 1974 exempts appropriated batture lands from the payment of compensation, it does not provide a definition of the term. See LSA-Const. Art. 6, § 42. The legislation implementing Art. 6, § 42, defines batture as having "the same meaning as that term was defined by the courts of this state as of the effective date of the Constitution of Louisiana." LSA-R.S. 38:281(1), 301. Accord Acts of 1979, No. 676. This definition is consonant with the Constitution's use of the term "batture."

III.
Batture is alluvion. Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 210, 36 Am.Dec. 624 (1841); Hollingsworth v. Chaffe, 33 La.Ann. 547 (1881); Ferriere v. City of New Orleans, 35 La. Ann. 209 (1883); Seibert v. Conservation Comm'n of Louisiana, 181 La. 237, 159 So. 375 (1935). See LSA-C.C. art. 499 (1979). It is formed successively and imperceptibly by alluvial accretions (sedimentation). Pulley & Erwin v. Municipality No. 2, 18 La. 278 (1841); Besson v. Mayor of Donaldsonville, 49 La.Ann. 273, 21 So. 262 (1897); Esso Standard Oil Co. v. Jones, 233 La. 915, 98 So.2d 236, 242, 249 (1957), on org & reh'g [growth is imperceptible if it can not be perceived at any given moment]. Batture below the ordinary low water mark is part of the bed of the river. 2 La.Civil Law Treatise § 119. To be susceptible of private ownership, the batture must be reclaimed from the river, i.e., it must form sufficient elevation and magnitude to rise above the waters and become part of the bank. Cochran v. Fort, 7 Mart. (N.S.) 622, 662 (1829); Barre v. City of New Orleans, 22 La.Ann. 612 (1870); Ferriere v. City of New Orleans, supra; La Branche's Heirs v. Montegut, 47 La.Ann. 674, 17 So. 247 (1895). See LSA-C.C. art. 499 (1979); La.Civ.Code of 1870 art. 509; see also 21 Tul.L.Rev. at 660.
Title to alluvion is purely an accessory right, attaching exclusively to riparian ownership, and incapable of existing without it. Heirs of Leonard v. City of Baton Rouge, 39 La.Ann. 275, 4 So. 241 (1887); Succession of Delachaise v. Maginnis, 44 La.Ann. 1043, 11 So. 715, 716 (1892); Pulley & Erwin v. Municipality No. 2, supra; Municipality No. 2 v. Orleans Cotton Press, supra; State v. Richardson, supra. The right of alluvion or batture is inherent in the riparian property, resulting from natural as well as municipal law. Barre v. City of New Orleans, supra; Hollingsworth v. Chaffe, supra. See LSA-C.C. art. 499 (1979); La.Civ.Code of 1870 art. 509. Like the bank, alluvion or batture belongs to the riparian owner but, as long as it is not actually incorporated into the main landas when it is separated from it by a levee or bankthe use of both the bank and batture remains in the public. Pulley & Erwin v. Municipality No. 2, 18 La. at 283-4. See Louisiana Ice Manuf'g Co. v. City of New Orleans, 43 La.Ann. 217, 9 So. 21 (1891); Ward v. Board of Levee Comm'rs of Orleans Levee Dist., 152 La. 158, 92 So. 769, 775 (1922) [held *610 that as to batture and the La. Const. of 1921, "the levee servitude extends only over the levees and the batture formed between the levee and river"]. See LSA-C.C. art. 499 (1979); La.Civ.Code of 1870 art. 509. Consequently, the riparian landowner has only naked legal title to the batture property subject to the servitude, without right of usus and fructus. Warriner v. Board of Comm'rs of Port of New Orleans, 132 La. 1098, 62 So. 157, 159 (1913). See LSA-C.C. art. 563 (1976)[17]; 2 La.Civil Law Treatise § 87; 21 Tul.L.Rev. at 661-663.
The land mass of batture susceptible of private ownership can become quite extensive. In Cochran v. Fort, supra, a cabin was built on the batture; in Minor's Heir v. City of New Orleans, 115 La. 301, 38 So. 999 (1905), Hunt v. City of New Orleans, 148 La. 754, 87 So. 736 (1921) and Heirs of Leonard v. City of Baton Rouge, supra, railroad tracks were built on the batture; in Succession of Delachaise v. Maginnis, supra, Louisiana Ice Manuf'g Co. v. City of New Orleans, supra, Ferriere v. City of New Orleans, supra, Hunt v. City of New Orleans, supra, and St. Anna's Asylum v. City of New Orleans, 104 La. 392, 29 So. 117 (1900), one or more city streets were located on the batture parallel to the river. Further, batture terrain was described as wooded pasturage in Louisiana Ry. & Navigation Co. v. Knox, 125 La. 454, 51 So. 493 (1910), and as "soggy [land], covered with a semiaquatic growth of willows, cottonwoods, and cockle burrs" in State v. Richardson, 72 So. at 986.
Batture has significant meaning in Louisiana history, law and jurisprudence. In the context of litigation on riparian rights of accretion, this court stated in Morgan v. Livingston, 6 Mart. (O.S.) 19, 216 (1819), that batture
is, according to Richlet and the French academy, a marine term, and is used to denote a bottom of sand, stone or rock mixed together, and rising towards the surface of the water: its etymology is from the verb battre, to beat: because a batture is beaten by the water. In its grammatical sense, as a technical word, and we believe in common parlance, it is the elevation of the bed of a river, under the surface of the water, since it is rising towards it. It is, however, sometimes used to denote the same elevation of the bank, when it has arisen above the surface of the water, or is as high as the land on the outside of the bank. (emphasis added)
The defendant therein endeavored, but failed, to establish that the batture existed at a certain point in time and was of the latter kind, a batture above the surface of the water. Morgan's definition was cited with approval in Hollingsworth v. Chaffe, 33 La.Ann. at 551, and endorsed in Heirs of Leonard v. City of Baton Rouge, 39 La. Ann. 275, 4 So. 241 (1886). In the latter case, riparian landowners sought, but failed, to recover batture from the city claiming the city was withholding more batture than was necessary for public use. This court declared "[t]he word `batture' has a precise legal signification," and provided a definition similar to Morgan's, but more pertinent to batture when it is susceptible of private ownership: "Vide Bouv. Law Dict. verbo "batture": `An elevation of the bed of a river under the surface of the water; but it is sometimes used to signify the same elevation when it has risen above the surface. The term `battures' is applied principally to certain portions of the bed of the Mississippi river which are left dry when the water is low, and are covered again, either in whole or in part, by the annual swells.'" 4 So. at 248. (emphasis added)
This court subsequently gave meaning to batture in the context of levee servitude appropriation in Boyce Cottonseed Oil Mfg. Co. v. Board of Comm'rs, 107 So. at 508-509. *611 Plaintiff had prevailed on his claim that his land had been destroyed for levee purposes within the meaning of the Constitution of 1921 when the levee was built behind his property, leaving the property between the levee and the river. In rejecting defendant's claim that the property was batture property within the meaning of the Constitution's batture exemption from compensation, this court determined without elaborating on the issue:
But plaintiff's land was not batture. The batture is that part of the river bed (sic) which is uncovered at time of low water, but is covered annually at the time of ordinary high water; when it ceases to be covered at the time of ordinary high water, it ceases to be batture and becomes part of the bank of the river. R.C.C. 457; Ward v. Board of Levee Commissioners, 92 So. 769, 772, 152 La. 158, 166.
Plaintiff's land was not covered in times of ordinary high water, although it had been covered by water on several occasions in periods of extraordinary high water during the last half of the century. (emphasis in original) 107 So. at 508-509.
Boyce illustrates that merely because land is on the outside of the levee, i.e., between the levee and the river, it is not necessarily batture. The pivotal factor to the Boyce court was whether the property was covered by ordinary high water. The court decided the land was not batture without specifying whether the land had alluvial origin. The factual circumstances that plaintiff's land and improvements "were thrown outside the levee" imply, however, that either it was not of alluvial origin or was of alluvial origin but had ceased to be batture[18] because the land had risen to such a height that it was not covered by ordinary high water.
From the foregoing we conclude that, according to pre-1974 jurisprudence of this court, batture is of alluvial origin; by accessory right it belongs to the riparian landowner when it rises above the bed of the stream or river; and it is subject to the Article 665 levee servitude when it is on the outside of the levee. Nevertheless, due to the limiting language in Boyce (and Heirs of Leonard), alluvial accretions are not subject to the batture exemption from compensation when it ceases to be covered annually by "ordinary high water." See 21 Tul.L.Rev. at 661.
The manner in which the Boyce court used the phrase "ordinary high water" connotes that the phrase means the highest level the river inevitably reaches during annual seasons of high water. Ordinary high water, then, is the highest water stage the river can be expected to reach annually, but not the level the water reaches during major flood events, i.e., reaches "on several occasions in periods of extraordinary high water during the last half of the century." 107 So. at 509. This meaning is consistent with the description of batture in Heirs of Leonard v. City of Baton Rouge, 4 So. at 243, as land covered by "annual swells," and in Warriner v. Board of Comm'rs for the Port of New Orleans, 62 So. at 158, as land subject to "periodical overflow." It is also consistent with the description of the upper boundary of the bank employed in Morgan v. Livingston, 6 Mart. (O.S.) at 229, that "the bank is the space which the water covers when the river is highest in any season of the year," and in Wemple v. Eastham, 90 So. at 638, that it is "the line which the edge of the water reaches at its ordinary high stagethat is, the highest stage that it usually reaches at any season of the year." See LSA-C.C. art. 456. Moreover, this definition, derived from pre-1974 jurisprudence, peacefully coexists with the purpose of the batture exemption, as it exposes a sufficient land surface for the exemption to be practicably utilized. A more restrictive meaning of ordinary high water would threaten the social utility of the exemption, as well as emasculating its practical purpose.

*612 IV.
Plaintiffs' theory that the upper boundary of batture must be determined by the physical characteristics of ordinary high water on the bank, is inharmonious and discordant with Louisiana's jurisprudential definition of batture. Plaintiffs' botanist, Dr. Luther F. Holloway, accepted by the trial court as an expert in determining vegetation demarcations, indicated his working definition of ordinary high water, which he derived from federal jurisprudence and on-site observations, corresponded to the COE's definition of the phrase for its determination of navigational servitudes, sovereignty boundary lines, etc. Dr. Holloway testified that the ordinary high water line relates to physical fact criteria and, basically, is the point in the river or stream where the water duration physically marks the soil and vegetation. Applying his definition, he placed the ordinary high water mark of Shingle Point at 8.5 feet because the water plants that tolerate substantial amounts of water ended at that line break. Under his definition of ordinary high water, most of Shingle Point cannot be batture merely because it is covered with various trees. Such a definition is antithetic to pre-1974 jurisprudence in which batture lands were described as wooded pasturage and/or semiaquatic with "growth of willows, cottonwoods, and cockle burrs." See Louisiana Ry. & Navigation Co. v. Knox, supra, and State v. Richardson, supra. It is also contrary to the trial court's on-site observation which showed Shingle Point, including its vegetation and trees, inundated at the 8.5 feet level.
Moreover, plaintiffs' hydrologist, Dr. Chester C. Watson, testified that the water level at Shingle Point is at or above 10.6 feet 5% of the year [approximately 18 days annually], at or above 9.78 feet 10% of the year [approximately 36 days annually], and at or above 8.44 feet 20% of the year [approximately 73 days annually]. Dr. Holloway also admitted the natural flood plane at Shingle Point is around 11.0 feet. Nevertheless, under Dr. Holloway's definition of ordinary high water, flooding [which would be any water levels above the 8.5 feet level] would persist 20% of the year [approximately 73 days annually] and would occur when the water is 0.2 of a foot above the toe (bottom) of the levee at Shingle Point. Application of his working definition of ordinary high water, which plaintiffs claim is a standard of federal and common law, produces results contrary to pre-1974 jurisprudence defining and characterizing batture, and confuses the distinction between major flood events and annual high water levels.
The construction of the phrase "ordinary high water" as it pertains to the batture exemption from compensation for levee servitudes depends solely upon pre-1974 jurisprudence of this state. The laws and jurisprudence of France, our sister states, and the United States are irrelevant to the quest for the meaning of ordinary high water in relation to the levee servitude and the rights of riparian landowners in Louisiana. State v. Richardson, 72 So. at 987[19]. The phrase must be construed in the context of the nature of batture and the history and purpose of Louisiana's batture exemption. Therefore, contrary to plaintiffs' contentions, Louisiana is not bound to indiscriminately follow a federal or common law definition of ordinary high water which has no connection to our definition of batture, the levee servitude or riparian landowner rights, as set forth in our Constitution, legislation and jurisprudence.

*613 V.
Applying these legal precepts to the findings and determinations of the trial court, as affirmed by the court of appeal, we find no error in their conclusions that all of Shingle Point is batture.
Both lower courts agreed that Shingle Point is composed of alluvial buildup, with the court of appeal indicating Shingle Point was characterized by defendant's fluvial geomorphalogist as an accumulation of sediment on the inside of a meander bend. 608 So.2d at 1107. The trial court concluded that Boyce and Wemple established the controlling guidelines for determining whether the plaintiffs' appropriated land was batture; that those cases meant "ordinary high water" is the highest stage that the river usually reaches annually; and that statistics "regarding the elevations the river usually reaches during approximately each year over a sufficient period of time" can be employed to satisfy the standards of Boyce and Wemple. The trial court utilized evidence of mean high water, the average of annual river stage peaks at a given location, to implement the definition of ordinary high water. Its determination is compatible with our interpretation of batture and "ordinary high water" as they pertain to the batture exemption.
As previously stated, the manner in which the Boyce court used "ordinary high water," the phrase means the highest level the river inevitably reaches during annual seasons of high water, which is the highest stage the river can be expected to reach yearly. The method employed for determining ordinary high water by defense experts and accepted by the trial court, is the method used for determining mean high water, the highest stage reached by the river approximately every year. The trial court did not err by applying that standard. It is consistent with the methodology accepted by this court for determining ordinary low water. See Esso Standard Oil Co. v. Jones, 98 So.2d at 242. Likewise, the corollary method is acceptable for determining the level of ordinary high water.
The trial court's calculation of mean high water was drawn from almost a century of river gauge data accumulated by the COE and reflected the normal behavior of the river without consideration of unusually high or low annual readings. The trial court indicated the overwhelming weight of expert testimony revealed mean high water at the times of the appropriations at Shingle Point was 11.0 feet and, accordingly, adopted 11.0 feet as the ordinary high water stage.[20] The trial court indicated that in 1973-75, several years prior to the Scarsdale project excavation, land elevations measured at Shingle Point were as follows: 10.2, 7.2, 9.3, 6.9, 7.7, 6.1, 8.7, 8.4, 9.5 and 10.8 feet. Immediately prior to the English Turn project excavation, the COE recorded twenty-five land elevations. Two elevations marginally exceeded 11.0 feet while the remaining twenty-three elevations were as follows: 8.7, 8.9, 10.2, 8.2, 6.7, 8.7, 8.3, 11.0, 10.8, 9.6, 8.0, 10.5, 7.7, 5.5, 6.2, 8.2, 7.2, 8.1, 6.97, 9.2, 9.2, 9.3, and 8.0 feet. Thus, based on elevational data showing 97% of Shingle Point is inundated when the river reaches 11.0 feet; on evidence that the only areas of Shingle Point not inundated when the river is 11.0 feet are isolated high spots created by man-made activity (prior excavations); and on the trial court's on-site inspection which revealed "with the exception of a few high spots on the up river portion, water covered the area with only the tops of the trees rising above the waters" when the river was 8.5 feet, the trial court concluded all of Shingle Point is batture and exempt from compensation.
In its review of the correctness of the trial court's factual findings, the court of appeal indicated that testimonial evidence based on historical maps/hydrographic surveys, aerial photographs and river gauge data compiled by the COE showed that while the maximum land elevations at Shingle Point varied over time, annual high water elevations of the river exceeded the *614 highest land elevations. It also indicated that expert witnesses concluded from their analysis of river gauge records that, on average, the highest stage the river reaches in any given year is approximately 11.0 feet. Based on the elevational data, the experts concluded that 97 to 99% of the surface of Shingle Point is inundated at the 11.0 feet stage, with the only areas not inundated being isolated high spots created by man-made activity. Therefore, it found no error in the trial court's conclusion that all of Shingle Point was batture at the time of the appropriations and, consequently, exempt from compensation under constitutional and statutory authority.
Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990); Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). We find no error in the appellate court's determination that the trial court did not abuse its discretion in evaluating the testimony of the parties' expert witnesses or in making its factual findings. Therefore, as the trial court's finding that the land taken from plaintiffs is batture, is consistent with the definition of batture as the term is used in the context of the batture exemption from compensation for the state's appropriation of riparian land pursuant to LSA-Const. Art. 6, § 42 and LSA-R.S. 38:301(C)(1)(a), we affirm.

DECREE
For the reasons assigned, the judgments of the lower courts in favor of defendant and dismissing the plaintiffs' consolidated suits, are affirmed. Costs are assessed against plaintiffs.
AFFIRMED.
LEMMON, J., concurs with reasons.
WATSON, J., dissents.
DENNIS, J., dissents with reasons.
LEMMON, Justice, concurring.
The ordinary high water stage is the level that the river in most years reaches and remains at for a substantial period of time. The evidence in this case that the river almost every year at Shingle Point reaches the level of eleven feet and stays at that level for a substantial number of days supports the trial judge's conclusion that the ordinary high water stage was eleven feet.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Marcus, J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[2] The Louisiana Constitution of 1974 exempts the state and its political subdivisions from compensating riparian landowners for the exercise of its levee servitude when the lands actually used or destroyed for levee or levee drainage purposes are "batture." LSA-Const. Art. 6, § 42. The constitutional provision is presently implemented in LSA-R.S. 38:301(C)(1)(a). For the text of those provisions, see notes 7 and 14, infra.

Appropriation is the taking of a servitude. A.N. Yiannopoulos, 2 La.Civil Law Treatise 3d (1991) § 88, n. 20 at p. 191. It is a mode for the state and its political subdivisions to exercise its levee servitude, whereby lands and improvements can be taken for levees purposes, before the payment of compensation. See LSA-Const. Art. 6, § 42(A) and (B), at n. 7. The right of appropriation proceeds upon the principle "that the riparian owner enjoys his property sub modo, i.e., subject to the right of the public to reserve space enough for levees, public roads, and the like. Over this space, the front proprietor never acquires complete dominion. It never passes free of this reservation by deed to purchaser." Ruch v. City of New Orleans, 43 La.Ann. 275, 9 So. 473 (1891). Unlike expropriation, appropriation of riparian property does not vest title property in the state or its political subdivisions. Delaune v. City of Kenner, 550 So.2d 1386 (La.App. 5th Cir.1989), writ den., 553 So.2d 475 (La.1989).
[3] LSA-Const. Art. 6, §§ 16 and 38 provide that levee districts can be reorganized, merged and consolidated with a parish. The Grand Prairie Levee District was consolidated and merged into the Parish of Plaquemines and the levee district ceased to exist as a separate entity.
[4] A "borrow pit" is an excavated area where material has been dug for use as fill at another location. Webster's New Collegiate Dictionary, 150th Anniv.Ed. (1981). "Borrow" or "borrow material" refers to the fill dirt excavated from the borrow pit.
[5] Pursuant to the Mississippi River Flood Control Act of 1928, 33 U.S.C. § 701-709, the COE oversees and maintains the Mississippi River and levee system. Once the COE selects a site for levee improvement, local governments like the PPG are obligated to furnish all needed rights of way and to appropriate the necessary riparian property. Nevertheless, neither the COE nor the United States government have an interest in this action. Moreover, the resolutions by the PPG, which authorized the appropriations of plaintiffs' lands, specifically state that the United States, its agents and employees are held blameless for any and all damages which may be caused by the levee construction and land appropriations.
[6] LSA-Const. Art. 1, § 4 provides in pertinent part as follows:

§ 4. Right to Property
Section 4. Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner ...
This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes.
(emphasis added.)
[7] LSA-Const. Art. 6, § 42 provides in pertinent part:

§ 42. Compensation for Property Used or Destroyed; Tax
Section 42. (A) Compensation. Notwithstanding any contrary provision of this constitution, lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law. However, nothing contained in this Paragraph with respect to compensation for lands and improvements shall apply to batture or to property the control of which is vested in the state or any political subdivision for the purposes of commerce ...
(B) Appropriation. Nothing in this Section shall prevent the appropriation of such property before payment.
(emphasis added.)
[8] Legal servitudes are limitations on ownership established by law for the benefit of the general public or for the benefit of particular persons. LSA-C.C. art. 659 (1977 revision), based on art. 664 of the La.Civil Code of 1870.
[9] LSA-C.C. art. 665 provides as follows:

Art. 665. Legal public servitudes
Servitudes imposed for the public or common utility, relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works.
All that relates to this kind of servitude is determined by laws or particular regulations.
[10] La. Const. of 1898, Art. 312 provided in pertinent part as follows:

Art. 312. Any person whose property has been appropriated within twelve months prior to the adoption of this Constitution, or whose property is hereafter appropriated by the Orleans levee board for levee purposes, shall have a right of action against said board ... for the value of said property ...
Provided, that this shall not apply
(1) To batture property,
* * * * * *
[11] In Ward v. Board of Levee Comm'rs of Orleans Levee Dist., 152 La. 158, 92 So. 769, 771 (1922), this court explained,

But when those rural lands, thus incorporated into the city, had long been divided up into lots and sold, so that one man owned only a small lot in front, and the land behind him belonged to others, it began to appear that it was no longer a case of giving up a small part of one's land and thereby getting protection for all the rest, but of one man being required to give up all his land, together with the improvements thereon, in order to protect the lands, not of himself, but of others.
[12] La. Const. of 1921, Art. 16, § 6 provided in pertinent part as follows:

§ 6. Compensation for property used or destroyed; tax
Section 6. Lands and improvements thereon actually used or destroyed for levees or levee drainage purposes, ... shall be paid for at a price not to exceed the assessed value of the preceding year; provided, that this shall not apply to batture, nor to property the control of which is vested in the State or any subdivision thereof for the purpose of commerce;...
(emphasis added.)
[13] See note 7, supra.
[14] In 1985, Chapter 4 of Title 38, R.S. 38:281 through 1480.9, was amended and reenacted by Acts 1985, No. 785, effective July 22, 1985, to consist of R.S. 38:281 through 513. The amendment had the general effect of consolidating into a single comprehensive scheme many parallel provisions.

LSA-R.S. 38:301(C)(1)(a) presently provides: "All lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss." (emphasis added.) The general content of this provision had been contained in LSA-R.S. 38:281.
[15] Acts of 1979, No. 676 amended and reenacted Subsections A and B of LSA-R.S. 38:281. Subsection B provided in pertinent part as follows:

§ 281. Construction and maintenance of levees and levee drainage; measure of compensation; recreation functions; filling vacancies
* * * * * *
B. All lands and improvements hereafter actually used, damaged or destroyed for levees or levee drainage purposes shall be paid for at fair market value to the full extent of the loss.
The measure of compensation for lands and improvements taken or destroyed for levees and levee drainage purposes shall be the fair market value of the property taken or destroyed before the proposed use of the property or construction of the levee or the levee drainage facilities, without considering any change in value caused by the construction of the levee or the levee drainage facilities ...
* * * * * *
However, nothing contained in this Subsection shall apply to batture or to property, the control of which is vested in the state or any political subdivision for the purpose of commerce.
"Batture" as used in this Section shall have the same meaning as that term was defined by the courts of this state as of the effective date of the Louisiana Constitution of 1974.
(emphasis added.)
[16] Both Acts of 1979, No. 676, applicable to the Scarsdale appropriations, and LSA-R.S. 38:301, applicable to the English Turn appropriations, which implement LSA-Const. Art. 6, § 42, exempt batture from compensation.
[17] Acts of 1976, No. 103, enacting LSA-C.C. art. 563, reproduced the substance of La.Civil Code of 1870 art. 553, but changed the law as it extends the right of the usufructuary to land formed in a river. Revision Comments, section (a). LSA-C.C. art. 563 provides as follows:

Art. 563. Alluvion
The usufruct extends to the increase to the land caused by alluvion or dereliction.
[18] Minor's Heirs v. City of New Orleans, supra, and Succession of Delachaise v. Maginnis, supra, indicate that batture property can cease to be batture.
[19] In State v. Richardson, 72 So. at 987, this court declared that although as a matter of federal constitutional law, by virtue of her sovereignty, Louisiana's boundary line on navigable waters was fixed at the mean/ordinary high water mark, the rights of riparian landowners is governed by Louisiana law. Consequently, riparian landowners on the banks of navigable rivers and streams own the banks, which is the land between the ordinary low and the ordinary high stage of the water, or when the levee is in close proximity to the water, the levee forms the bank. LSA-C.C. art. 456. Thus, the Richardson court concluded that the laws and jurisprudence of France, our sister states, and the United States is not relevant to the inquiry of what ordinary or mean high water is in relation to the levee servitude and the rights of riparian landowners. 72 So. at 987.
[20] In comparison, trial evidence showed floods which occur approximately every 9 years and which the National Weather Service labels as a minimum flood stage, is the 12.5 feet level at Shingle Point.