# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-666


**DELHI PLANTATION, LLC, ET AL**

**VERSUS**

**FIFTH LOUISIANA LEVEE DISTRICT, ET AL**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 50997
HONORABLE KATHY A. JOHNSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Charles G. Fitzgerald, Judges.



**REVERSED AND RENDERED.**

**V. Russell Purvis**
**Bradley Burget**
**SMITH, TALIAFERRO & PURVIS**
**ATTORNEYS AT LAW**
**P.O. Box 298**
**Jonesville, LA 71343**
**(318) 339-8526**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Delhi Plantation, LLC**
    **Allred Land Company, Inc.**
    **Richard Calvin Alwood**

**Patrick B. McIntire**
**OATS & MARINO**
**Gordon Square, Suite 400**
**100 East Vermilion Street**
**Lafayette, LA 70501**
**(337) 233-1100**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **State of Louisiana Department of Transportation**
    **and Development**

**John D. Crigler, Jr.**
**James E. Paxton**
**BISHOP, PAXTON, CRIGLER & MOBERLEY, APLC**
**P.O. Box 97**
**St. Joseph, LA 71366**
**(318) 766-4892**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Fifth Louisiana Levee District**

**WILSON, Judge.**

This case concerns the appropriation of a portion of land owned by members of the Alwood family (Plaintiffs), by the Board of Commissioners Fifth Louisiana Levee District (the Levee Board) for a project to raise and strengthen the levee in Concordia Parish along the Mississippi River. The central issue is whether the properties used for the project were non-compensable batture pursuant to La.Const. art. 6 § 42 and what damages are owed to Plaintiffs. After a five-day bench trial, the trial court rendered a judgment in favor of Plaintiffs. Defendants, the Levee Board and the Louisiana Department of Transportation and Development (DOTD), now appeal. For the reasons expressed below, we reverse the judgment of the trial court and render judgment in favor of Plaintiffs in the amounts expressed below.

I.

## ISSUES

In this appeal, we must decide:

(1)　whether the trial court erred in finding the properties were not subject to the levee servitude and that the Levee Board acquired no rights by appropriation;

(2)　whether the trial court erred in accepting Dr. Suhayda's calculation of batture and in finding that none of the properties contained batture;

(3)　whether the trial court erred in allowing compensation for borrow pit excavation by the cubic yard;

(4)　whether the trial court erred in awarding damages for lost CRP payments;

(5)　whether the trial court erred in the calculation of the acreage taken for berms;

(6)	whether the trial court erred in awarding damages for severance value or "loss of access" to a portion of the properties; and

(7)	whether the trial court erred in failing to dismiss DOTD.

II.

## FACTS AND PROCEDURAL HISTORY

The three plaintiffs are all members of the Alwood family and own approximately nine hundred and eighty acres along the Mississippi River in Concordia Parish. The mainline Mississippi River Levee runs through the properties. Allred Land Company, Inc. is owned by John Alwood; Delhi Plantation, LLC is owned by the children and grandchildren of Carolyn Alwood; and the remainder of the properties are owned by Richard Alwood.

The Levee Board sent letters to the Alwoods on April 6, 2015, notifying them that resolutions of appropriation had been passed on February 18, 2015, and the Levee Board had adopted resolutions of appropriation of Alwood lands for a project titled Flood Control/Mississippi River & Tributaries, West Bank Mississippi River Levees, Waterproof to Upper Lake Concordia, Louisiana, Levee Enlargement and Berms, Item 374-R (the project) on April 6, 2015. The purpose of the project was to expand the existing levee. The project was managed by the Corps of Engineers, and much of the dirt for raising and strengthening the levee was excavated from Plaintiffs' properties in the form of borrow pits. Ryan McMillin of the DOTD performed a batture analysis to calculate how much of the borrow pit was in the batture. The Levee Board then retained an appraiser, Gregg Wilbanks, Jr., to value the properties taken.

2

On March 8, 2016, the Levee Board informed plaintiffs that the appraisals had been done by a DOTD approved appraiser. The appraisals consisted of permanent and temporary servitudes. The Levee Board submitted offer letters to each plaintiff, offering to pay the appraised value for the properties taken, though no compensation was offered for what DOTD determined was batture. The Levee Board made the following offers:

Delhi Plantation, LLC—$66, 288.00

Allred Land Co.—$22, 062.00

Richard Alwood—$69, 709.00

Plaintiffs refused to accept the offers and filed suit against the Levee Board for compensation on October 4, 2017. Plaintiffs also named the Louisiana Department of Natural Resources (DNR) as a defendant. On April 23, 2018, DNR filed a motion for summary judgment seeking dismissal. On June 5, 2018, Plaintiffs filed a first amended and supplemental petition for damages substituting DOTD in place of DNR. DNR's motion for summary judgment was decreed moot.

A bench trial was conducted beginning on September 20, 2021. Trial continued September 21, 23, 24, and December 10, 2021. At the conclusion of trial, the trial court took the matter under advisement. On July 20, 2022, the trial court rendered judgment in favor of Plaintiffs. The trial court found that the properties were not subject to the levee servitude and that none of the land was batture. The trial court then awarded each plaintiff compensation for:

1. The value of the dirt excavated from the borrow pit, priced by the cubic yard;

2. The value of lost Conservation Reserve Program (CRP) payments;

3. The value of the land taken on the river side of the levee;

3

4. The value of the land taken for berm construction on the protected side of the levee; and

5. Severance damage for land on the river side of the levee for which access was cut off.

Richard Alwood was awarded $686,511.21; Delhi Plantation was awarded $940,995.88; and Allred Land Company was awarded $292,833.86. The total amount awarded was $1,920,340.95. Defendants now appeal.

III.

## STANDARD OF REVIEW

In its written reasons for judgment, the trial court notes that this case presents a classic battle of the experts that was resolved by the trier of fact through factual findings and credibility determinations. It is well settled that a court of appeal may not set aside a trial court's finding of fact in absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Ordinarily, questions of expert credibility are for the trier of fact, "unless the stated reasons of the expert are patently unsound." *Lirette v. State Farm Ins. Co.*, 563 So.2d 850, 853 (La.1990).

However, when the trial court applies incorrect principles of law, and such error materially affects the outcome and deprives a party of substantial rights, a prejudicial legal error has occurred. *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731. "[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." *Id*. at 735. The factual findings in this case required conformity with the requirements set out in *DeSambourg v. Bd. of Comm'rs for Grand Prairie Levee Dist*., 621 So.2d 602

4

(La.1993). In the instant case, we find that the trial court misunderstood the requirements set out by the Louisiana Supreme Court in *DeSambourg* and this legal error resulted in erroneous factual findings that require a de novo review by this court.

IV.

**LAW AND DISCUSSION**

**LEVEE SERVITUDE**

In their first assignment of error, Defendants assert that the trial court erred in finding that the properties were not subject to the levee servitude, and that the Levee Board had acquired no rights by appropriation. In its written reasons for judgment, the trial court held, "The Court as shown hereafter finds that the Alwood lands did not constitute batture and are not subject to the levee servitude. As such the appropriation by the Levee Board was a wrongful illegal taking and no servitude was acquired by the Levee Board." The trial court then goes on to discuss the legal requirements for the determination of batture. The trial court appears to have conflated the issue of whether the levee servitude applied with the issue of whether the land taken was non-compensable batture.

Louisiana Civil Code article 665 provides,

> Servitudes imposed for the public or common utility relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers and for the making and repairing of levees, roads, and other public or common works. Such servitudes also exist on property necessary for the building of levees and other water control structures on the alignment approved by the U.S. Army Corps of Engineers as provided by law, including the repairing of hurricane protection levees.

> All that relates to this kind of servitude is determined by laws or particular regulations.

"In Louisiana, title to riparian lands fronting on navigable rivers is subject to the superior right of the public's legal servitude for the making and repairing of levees, roads and other public and common works." *DeSambourg,* 621 So.2d at 606. "It applies to those lands that were riparian when separated from the public domain, and when the levee is necessary for the control of flood waters from the river to which the land taken is riparian." *Id.* at 607. In this case, the parties stipulated that the properties were riparian when separated from the sovereign and remained riparian when appropriated. Moreover, Mr. Mayeaux, a professional surveyor recognized as an expert, testified without contradiction that the properties have always been riparian to the Mississippi River. Riparian land may be subject to the levee servitude without consisting of batture. This is reflected in La.R.S. 38:301(C) which provides, in pertinent part,

> (1)(a) All lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss.
>
> (b)(i) The owner shall be given written notice of the appropriating resolution by the levee board within ten days of the date of its passage.

Thus, it is apparent that riparian land may be subject to appropriation under the levee servitude although it does not constitute batture. Accordingly, it was legal error for the trial court to determine that the appropriation was illegal, and the levee servitude did not apply because the land was not batture.

## BATTURE CALCULATION

In their second assignment of error, Defendants assert that the trial court erred in accepting Dr. Suhayda's calculation of batture and in finding that none of the properties contained batture. As previously noted, batture land is exempted from

the need for compensation when taken for levee purposes. Louisiana Constitution Article 6 § 42 provides that "lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law." It then goes on to state, "[h]owever, nothing contained in this Paragraph with respect to compensation for lands and improvements shall apply to batture or to property the control of which is vested in the state or any political subdivision for the purpose of commerce." As such, the determination of batture is critical in this case and lays at the heart of Defendants' appeal.

Louisiana Revised Statutes 38: 281 (1) provides, "'Batture' shall have the same meaning as that term was defined by the courts of this state as of the effective date of the Constitution of Louisiana." The Louisiana Supreme Court set out to define the term batture for purposes of the batture exemption and approve a method for determining batture in the seminal case of *DeSambourg,* 621 So.2d 602.

In *DeSambourg*, the court reviewed relevant jurisprudence and determined that "[i]n the context of the batture exemption from compensation, 'batture' is alluvial accretions annually covered by 'ordinary high water,' the highest stage the river can be expected to reach annually in seasons of high water." *Id*. at 604. The court further specified that "'[o]rdinary high water', then, is the highest water stage the river can be *expected* to reach annually, but not the level the water reaches during major flood events, i.e., reaches "on several occasions in periods of extraordinary high water during the last half of the century.'" *Id.* at 611. The court reasoned:

> this definition, derived from pre–1974 jurisprudence, peacefully coexists with the purpose of the batture exemption, as it exposes a sufficient land surface for the exemption to be practicably utilized. A more restrictive meaning of ordinary high water would threaten the social

7

> utility of the exemption, as well as emasculating its
> practical purpose.

*Id.*

After defining the term batture, the court determined that "the method used for determining mean high water, the highest stage reached by the river approximately every year[,]" is an appropriate method for determining ordinary high water. *Id*. at 613. "It is consistent with the methodology accepted by this court for determining ordinary low water. See *Esso Standard Oil Co. v. Jones*, 98 So.2d at 242. Likewise, the corollary method is acceptable for determining the level of ordinary high water." *Id*.

All parties agree that the *DeSambourg* protocol is the appropriate method to determine the ordinary high-water mark and whether the land constitutes batture in this case. The Plaintiffs argued, and the trial court agreed, that Plaintiffs' expert, Dr. Suhayda, was the only witness who followed the *DeSambourg* protocol. After reviewing Dr. Suhayda's report and testimony, it appears that Dr. Suhayda misunderstood the requirements of *DeSambourg*. Dr. Suhayda testified that batture must be found in the riverbed or main channel of the river. He asserted that under *DeSambourg*, there is no batture on the floodplain, and as such, he excluded data from any year when the water was above 65 feet, the elevation of the floodplain. In total, he excluded thirty of the fifty-four years used in the dataset. This is not the protocol established in *DeSambourg*, and the trial court erred in holding that Dr. Suhayda was the only expert to follow *DeSambourg*.

The court in *DeSambourg* never limits batture to the riverbed or main channel of the river. In fact, the court specifically rejected the method of determining batture by the physical characteristics of the bank stating that the

8

"theory that the upper boundary of batture must be determined by the physical characteristics of ordinary high water on the bank, is inharmonious and discordant with Louisiana's jurisprudential definition of batture." *Id.* at 612. Instead, the court determined that the method used for determining mean high water by the defense experts was appropriate for determining ordinary high water.

Contrary to the assertions of Dr. Suhayda, *DeSambourg* makes no mention of excluding data from the mean calculation; rather, the court excludes "the level water reaches during major flood events" and "periods of extraordinary high water" from the definition of ordinary high water. *Id.* at 611. The court concluded that using the mean "reflected the normal behavior of the river without consideration of unusually high or low annual readings." *Id.* at 613. This is because, by nature of using a mean calculation, the unusually low and high readings balance each other out to come up with the average. In the *DeSambourg* case, the trial court accepted the defense's theory that "the upper boundary of batture is the equivalent of mean high water and is determined by reviewing the statistics on the elevations the river usually reaches annually over a sufficient period of time." *Id.* at 605. The supreme court held that this method was the acceptable approach for finding batture.

In excluding every year that the high water entered the flood plain, Dr. Suhayda veered away from the approach approved in *DeSambourg*. Of the fifty-four years of data available, Dr. Suhayda excluded thirty. The purpose of using the mean is to determine the *ordinary* high water i.e. the level the water is *expected* to reach annually. If the water levels enter the floodplain more often than not, it cannot be said that such levels are extraordinary or represent a major flood event. In fact, entering the flood plain can be expected. By excluding the thirty highest years of water levels, Dr. Suhayda's mean calculation only included twenty-four years of

data and his calculation of the ordinary high-water mark was artificially low at 61 feet. This in turn resulted in a finding that none of the property contained batture. However, because Dr. Suhayda misunderstood the law as provided in *DeSambourg*, he did not follow the proper protocol for determining ordinary high water, and the trial court erred in accepting Dr. Suhayda's calculation of batture.

The trial court's acceptance of Dr. Suhayda's batture calculation was a legal error and, as such, we will now review the record de novo to determine the proper calculation of batture. The defendants put on three different witnesses who testified concerning batture. Mr. Ryan McMillin, the DOTD engineer, testified that he determined batture by calculating the elevation at which it would flood 70% of the time. This approach is clearly not in line with *DeSambourg*. Mr. McMillin admitted that he was unaware of the *DeSambourg* decision and Defendants do not argue that the approach used by Mr. McMillin was correct. Accordingly, Mr. McMillin's ordinary high-water calculation of 64 feet is rejected by this court.

Similarly, Mr. Michael Mayeux testified that he calculated the ordinary high water by cutting off any annual high at the flood stage of 65.28 feet and using instead a value that was 1/100 of a foot below that level (65.27 feet) in his calculation of the mean. This approach resulted in a mean annual high of 65.4 feet. By altering the numbers used, however, Mr. Mayeux also veered away from the protocol established in *DeSambourg,* and his calculation is also rejected.

A review of the record reveals that Dr. Richard Kessel was the only witness who accurately followed *DeSambourg* in his approach. Dr. Kessel testified that he calculated the batture by adding up the annual high-water data from the Natchez and Vicksburg gauges and dividing to calculate the mean at those locations. He also mentioned that he throws out the highest number from his calculation. This

is the same approach used in *DeSambourg*. In fact, Dr. Kesel testified that he testified in the *DeSambourg* case, and it was his method that was approved by the court.

Dr. Kesel also testified in *Biglane v. Bd. of Commissioners, Fifth Louisiana Levee Dist.*, 18-100 (La.App. 3 Cir. 6/19/17), 256 So.3d 1052, *writ denied*, 18-1767 (La. 1/8/19), 260 So.3d 588. Plaintiffs argue that Dr. Kesel's testimony should be rejected in this case because in calculating the mean he excluded a different year than he did in the *Biglane* case. Dr. Kesel explained that when he calculates a mean, he always excludes the highest number. Trial in the *Biglane* case began in 2009 and included the years 1960-2008 in its dataset. As such, in that case he excluded the year 1973 because it was the highest year in that dataset. In the present case, the data covered the years 1960-2013 and the highest annual high water recorded was not in 1973, but in 2011. Consequently, using his method of excluding the highest year only, he excluded the year 2011. Although the numbers varied from the *Biglane* case, it is clear that Dr. Kesel used the same method that was approved in both *DeSambourg* and *Biglane.*

Plaintiffs point out that Dr. Kesel admitted to making a mistake in his calculation; however, that error was minor. Dr. Kesel testified that, when changing his data between computer programs, he accidently input fifty-two units of data when it should have been fifty-three. This error resulted in a mean high water of 69 feet. The mistake was acknowledged, and Dr. Kesel submitted a revised final report using fifty-three units of data and rendering a mean high-water elevation of 68 feet. We find that because Dr. Kesel was the only witness to follow the *DeSambourg* protocol, his calculation of batture is correct, and we will use it to determine the appropriate measure of compensation.

11

Plaintiffs also argue that Dr. Kesel's calculation should be rejected because it was based on his determination of the slope of the river while Dr. Suhayda based his calculation on the gauge placed on the river adjacent to the Alwood properties. The *DeSambourg* protocol requires the use of annual high-water readings over a sufficient period of time. Unfortunately, there is no historical data for the precise location of the subject property.

The nearest Corps of Engineer's gauge is located 11 miles downstream at Natchez. To determine the ordinary high water at the location, Dr. Kesel determined the ordinary high at the Natchez gauge (64.6 feet) and the ordinary high at the Vicksburg gauge (87.1 feet) which is 72 miles upstream from the Natchez gauge. Using those numbers, he determined that the river has an average slope between Natchez and Vicksburg of .31 feet per river mile. He then interpolated the ordinary high water at the properties by multiplying the distance from the Natchez gauge (11 miles) by the slope (.31 ft/mile) and adding that number (3.4 feet) to the ordinary high-water elevation at Natchez. This is how he came up with an ordinary high water at the properties of 68 feet.

Dr. Suhayda directed the plaintiffs' engineer, Bryant Hammett, to place gauges on the riverbank adjacent to the Alwoods' properties and compared readings with the readings from the Natchez gauge. Based on this gauge, Dr. Suhayda adjusted the Natchez gauge readings by adding 1 ½ feet to the readings to determine the ordinary high-water mark of the Alwood properties to be 61.2 feet. Plaintiffs argue that the landowner placed gauges are more accurate than using the slope of the river, because this assumes that the river slope is constant. However, there were several issues affecting the accuracy of the landowner gauges. Foremost, the gauges were placed about a mile downriver from the actual property and only used to collect

12

a few water level readings over a length of time spanning less than a year (November 2019-July-2020). Additionally, these gauges were not capable of showing water elevations when the river was at its highest because they were too short. Dr. Suhayda acknowledged that the difference in elevation between two points is at its highest when the elevation of the river is highest. Moreover, Mr. Hammett acknowledged that there were several errors in the reports of gauge readings from the landowner gauges, some of which were off by almost a foot. Accordingly, we refuse to accept the readings from the landowner-placed gauges.

In contrast, Dr. Kesel testified that it was standard practice for the Corps of Engineers to utilize the slope of the river to make its calculations. It would be impractical for the Corps to place gauges at every single mile marker, and under the circumstances, interpolating the ordinary high water based on the river slope was a reasonable and reliable method. Moreover, Dr. Kesel testified that he used this same method of interpolation in his calculations for the *DeSambourg* case. We accept Dr. Kesel's calculation of ordinary high water at the properties.

According to Dr. Kesel's calculations, the ordinary annual high-water elevation of the Mississippi River at the properties is 68 feet. Using the Corps of Engineers topographic survey on the unprotected/flood side of the levee for the properties, there are only two acres of permanent servitude on the unprotected side of the levee that are not batture. One acre belongs to Richard Alwood and one belongs to Delhi Plantation. Mr. Wilbanks' appraisal valued the land on the unprotected side of the levee at 90% of $2,850.00 per acre for the permanent servitudes. Therefore, we reverse the award of the trial court as it relates to compensation for the permanent servitudes on the unprotected side of the levee and

13

award compensation in the amount of $2,565 each to Richard Alwood and Delhi Plantation for the permanent servitudes on the unprotected side of the levee.

## COMPENSATION BY THE CUBIC YARD

In their third assignment of error, Defendants argue that the trial court erred in allowing compensation for borrow pit excavation by the cubic yard. The largest part of the trial court's damage award was the $1,305,128.75 awarded for the excavated dirt. After reviewing the record, we find that the trial court erred in its award for the dirt excavation. As previously stated, virtually all the land in the borrow pit was batture and, as such, is not compensable. Even if the borrow pits did not consist of batture, it was error to compensate Plaintiffs by the cubic yard for the borrow pit excavation.

Louisiana Constitution Article 6, § 42 states that, "[n]otwithstanding any contrary provision of this constitution, lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law." Under La.R.S. 38:301(C)(1)(a), "[a]ll lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss." Louisiana Revised Statutes 38:301(C)(1)(h) further provides;

> The measure of compensation for lands and improvements taken or destroyed for levee and levee drainage purposes by way of a permanent levee servitude shall be the fair market value of the property taken or destroyed before the proposed use of the property or construction of the levee facilities, without allowing any change in value caused by the construction of the levee facilities.

Plaintiffs rely on *National Food & Beverage Co., Inc. v. United States*, 105 Fed.Cl. 679 (2012) for their contention that they are entitled to compensation for the cost of the dirt removed from their properties. In *National Food*, the

landowner was compensated by the cubic yard when the Corps of Engineers excavated 383,000 cubic yards of clay from the property to repair levees after Hurricanes Katrina and Rita. The court noted that,

> courts are often reluctant to calculate the value of a mineral deposit by "estimating the number of tons in place and then multiplying the tonnage by a unit price per ton." *United States v. 91.90 Acres of Land*, 586 F.2d 79, 87 (8th Cir.1978). Instructively, however, an exception to the disinclination to rely on volumetric measurement "occurs where the mineral deposit itself is the property being condemned," for "[i]n such a case the deposit is treated as merchandise rather than land." 4 Nichols on Eminent Domain § 13.14[3]; see also *United States v. 22.80 Acres of Land, More or Less*, 839 F.2d 1362, 1364 n. 2 (9th Cir.1988) (approving a cubic-yard basis of compensation where "the government is taking the [material] itself, [and] not the overlying parcel of land").

*Id.* at 700. The court held that the highest and best use of the property in that case was a borrow pit, and the best measure of the taking was the value of the removed clay.

We find that this case is inapplicable to our present case. It is important to note that *National Food* was analyzed under the standards of the Fifth Amendment and not Louisiana law. In *S. Lafourche Levee Dist. v. Jarreau*, 16-788 (La. 3/31/17), 217 So.3d 298, this court distinguished *National Food* and refused to award compensation by the cubic yard for dirt removed. In *Jarreau*, the landowner was in the business of excavating dirt when a portion of his property was appropriated for hurricane protection projects. After determining that the 2006 amendments to La. Const. art. I, § 4; La. Const. art. VI, § 42; and La.R.S. 38:281(3) and (4) reduced, rather than eliminated, the measure of damages to be paid to a property owner for hurricane protection projects from "full extent of the loss" to the more restrictive "just compensation" measure required by the Fifth Amendment to the United States

Constitution, which is the fair market value, the court determined that, "The dirt's value in this case is subsumed in the value of the surface, and it is only after extraction and delivery to another location that the dirt has additional value." *Id.* at 313. The court distinguished *National Food* because "*National Food* did not involve a levee servitude appropriation where the government had a pre-existing right to the landowner's property." *Id.*

The instant case does not involve a hurricane protection project, so Plaintiffs are entitled to compensation at the fair market value to the full extent of the loss. Louisiana Revised Statutes 38:281(3) defines fair market value as "the value of the lands or improvements actually taken, used, damaged, or destroyed for levees or levee drainage purposes as determined in accordance with the uniform criteria for determining fair market value as defined in R.S. 47:2321 et seq." Under La.R.S. 47:2321,

> Fair market value is the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.

"The current use of the property is presumed to be the highest and best use, and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on the landowner." *W. Jefferson Levee Dist. v. Coast Quality Const. Corp*., 640 So.2d 1258, 1275 (La.1994).

Unlike the land in *National Food*, the highest and best use of the land in the present case was not a borrow pit but rather recreation and row crops, as this was the current use of the property. The burden was on Plaintiffs to show that the full extent of the loss included the price per cubic yard of the dirt removed. Under La.R.S. 38:281(4), "'[f]ull extent of the loss' shall not be construed to include payment for uses which are remote, speculative, or contrary to law; uses for which the property is still suitable; or elements of property ownership which are not actually taken, used, damaged, or destroyed for levees or drainage purposes."

The prospect of selling dirt from the lands in this case was both remote and speculative. There was no evidence presented that any of the land was currently being used for dirt sales or that any of the plaintiffs had any plans to sell dirt from any of the properties. The only dirt sale that could be identified from any of the properties was to the state for a highway project in the 1990s. Moreover, the evidence presented to determine the value of the excavated dirt was inadequate. Plaintiffs did not hire an appraiser, but relied on the testimony of their engineer, Mr. Hammett, who merely called around to a few people to inquire about what they pay for dirt. Specifically, Mr. Hammett asked the dirt contractors to price the dirt for the levee project itself. This is in violation of La.R.S. 38:301(C)(1)(h) which prohibits any change in valuation of the property caused by construction of the levee itself.

In *National Food*, experts testified to the preexisting demand for clay before the Corps began their project. If plaintiffs were entitled to any compensation for the value of the dirt, they were required to prove the market value of such dirt aside from the levee project. Plaintiffs failed to establish that they were entitled to compensation for the value of the excavated dirt, and the value of the dirt was subsumed in the value of the surface. The trial court erred in awarding compensation

17

by the cubic yard for the removal of dirt. We therefore reverse the $1,305,128.75 awarded to Plaintiffs for excavated dirt.

## LOST CRP PAYMENTS

In their next assignment of error, Defendants assert the trial court erred in awarding damages for lost CRP payments. The plaintiffs each had contracts with the Farm Services Administration to keep portions of their property in the Conservation Reserve Program (CRP). As part of the program, Plaintiffs were paid to allow the affected area to grow trees. Inevitably, some of Plaintiffs CRP acreage was lost when the Corps cleared the land as a part of the levee project. As stated previously, Plaintiffs are entitled to compensation to the full extent of the loss. Our courts have determined that the full extent of the loss includes business losses such a lost profit which are distinct from the value of the land. *Vela v. Plaquemines Par. Gov't*, 00-2221 (La.App. 4 Cir. 3/13/02), 811 So.2d 1263, *writ denied,* 02-1350 (La. 6/21/02), 819 So.2d 337, and *writ denied* 02-1224 (La. 6/21/02), 819 So.2d 343.

Unlike the claim for the value of the dirt, Plaintiffs lost CRP payments were neither remote nor speculative. The record includes copies of the CRP contracts for each plaintiff revealing the rates paid per acre under the program and the exact extent of the loss can be properly calculated. However, Plaintiffs are not entitled to compensation for the loss of CRP payments on any land that is considered batture. The trial court awarded $62,722.00 to Richard Alwood, $80,866.00 to Delhi Plantation, and $7,630.70 to Allred Land Company for lost CRP payments.

All of the lost CRP for Allred Land Co. was within the borrow pit area, and within the batture. Thus, the trial court's award of compensation for lost CRP

18

to Allred Land Co. was in error and is hereby reversed. The Delhi Plantation lost approximately 44.04 acres of CRP due to the levee project. Only one acre of the Delhi Plantation property on the unprotected side of the levee was non batture, thus Delhi Plantation can only be compensated for lost CRP on one acre of land. Under Delhi Plantation's CRP contract, they were paid at a rate of $144.58 per acre annually. Delhi Plantation's contract was reduced in 2018 and was set to expire in 2029, therefore they lost twelve years of CRP payment. We award Delhi Plantation a total of $1,734.96 for the lost CRP on one acre.

Mr. Richard Alwood also had one acre of non batture land on the unprotected side of the levee. Under his CRP contract, he was paid at a rate of $117.60 per acre annually. The CRP was lost starting in 2018 and was set to expire in 2029, therefore Mr. Alwood lost twelve years of CRP payment. We award Mr. Alwood $1,411.20 for the lost CRP on one acre on the unprotected side of the levee.

Mr. Alwood had some property within Parcels 3-1 and 3-3 on the protected side of the levee under CRP contract which was non-batture. Prior to the levee project, Mr. Alwood had 202.8 acres in CRP on the protected side of the levee. He was compensated at a rate of $149.60 per acre which amounted to $30,339.00 annually. After the levee project, Mr. Alwood's acreage was reduced to 183.94 acres and his annual income was reduced to $27,517.00 annually. As a result of the levee project, Mr. Alwood's annual lost income was $2,822.00 for a total loss of $19,754.00 for the remaining seven years of his contract. We reverse the trial court's award of $62,722.00 for lost CRP to Mr. Alwood and award him a total amount of $21,165.20 for lost CRP payments.

**BERM ACREAGE**

In their fifth assignment of error, Defendants allege that the trial court erred in the calculation of the acreage taken for the berms on the protected side of the levee. The appraisals from Mr. Wilbanks included offers of compensation for the extension of the berms. Those parcels may be summarized as follows:

> Allred Land Co.—Tracts 5-2 (1.71 acres permanent servitude) and 5-3 (0.81 acres temporary servitude)
>
> Richard Alwood—Tracts 3-1(9.38 acres permanent servitude) and 3-3 (3.33 acres temporary servitude)
>
> Delhi Plantation—Tracts 4-2 (1.58 acres permanent servitude), 4-3,4-4,4-5, and 4-6 (collectively 3.14 acres temporary servitude).

It was brought out during the trial that the berms were extended by more than the acreage set forth in the right of way plans and Mr. Wilbanks' appraisals. Mr. Hammett testified that he determined the berm acreage by taking a map of the area provided by the Corps of Engineers and overlaid it with plot points of the taking and property lines. He then used a computer program to calculate the acreage. He determined that a total of 39.01 acres was taken for the berms, as opposed to the 19.95 acres included in Mr. Wilbanks' appraisals. Mr. Hammett determined that a total of 22.22 acres was taken from Richard Alwood, a total of 10.21 acres was taken from Delhi Plantation, and a total of 6.58 acres was taken from Allred Land Company. In contrast, the appraisals included 12.710 acres for Richard Alwood, 4.720 for Delhi Plantation, and 2.52 for Allred Land Company. These numbers included acreage for both the permanent and temporary servitudes.

The trial court left the record open for Mr. Mayeaux to do a survey of the berms and give Defendants an opportunity to address the issue. Mr. Mayeaux received the coordinates that Mr. Hammett used to map the perimeter of berm as illustrated by Mr. Hammett. Using these coordinates, Mr. Mayeaux went onto the

property to investigate the actual perimeter of the berm. Mr. Mayeaux testified that based on his on the ground observations, the boundaries illustrated by Mr. Hammett were inaccurate and included areas that were not actually part of the berm or were part of the pre-existing berm. He also submitted photographs showing areas that were claimed to be berm by Mr. Hammett, but clearly were not. Plaintiffs' counsel even offered to stipulate that portions of Mr. Hammett's berm calculation incorrectly included certain areas that were not part of the berm. Moreover, when confronted with the inaccuracies in Mr. Hammett's illustration of the berm area, Plaintiffs' counsel asserted that Mr. Hammett never intended for it to be an accurate depiction but was merely a reference. Accordingly, we find that it was error to rely on Mr. Hammett's determination of berm acreage.

Mr. Mayeaux determined that only an additional 9.01 acres were taken for the berms. Defendants argue that nearly all of the additional acreage was accounted for by a prior acquisition in the 1960s. However, the parties stipulated during the pre-trial conference that any claim of a previous taking was waived. Mr. Wilbanks' appraisal valued the berm on Richard Alwood's property at 90% of $2850 ($2,565) per acre for the permanent servitudes and 10% of $2850 per acre per year for the temporary servitudes. The temporary servitude was for a period of four years, so the value of the temporary servitude is 40% of $2850 ($1,140) per acre. Delhi Plantation and Allred Land Company's properties were valued at 90% of $3850 ($3,465) per acre for permanent servitudes and 40% of $3850 ($1,540) per acre for the temporary servitudes. It was also discovered that .49 acres attributed to Allred Land Company belonged to Delhi Plantation.

21

Based on Mr. Mayeaux's survey and supplemental report, in conjunction with Mr. Wilbanks' appraisals of the properties, the plaintiffs are entitled to the following compensation for the berm area:

**Richard Alwood**—$30,292.65($2850/acre x 90% x (9.38 acres+2.43 acres berm))

+ $3,796.20 ($2850/acre x 40% x. 3.33 acres temporary)

**Delhi Plantation**—$17,394.30 ($3850/acre x 90% x (1.58+2.95+0.49 acres berm))

+ $4,835.60 ($3,850/acre x 40% x 3.14 acres temporary)

**Allred Land Co.**—$16,805.25 ($3,850/acre x 90% x (1.71+3.63-0.49 acres berm))

+ $1,247.40 ($3,850/acre x.40% x 0.81 acres temporary).

## SEVERANCE

In their sixth assignment of error, Defendants assert that the trial court erred in awarding damages for severance value or loss of access to a portion of the properties. Plaintiffs Delhi Plantation and Allred Land Company were awarded $112,149.00 and $43,605.00 respectively for loss of access. Mr. Hammett claimed that Allred Land Company lost access to its entire 17.1-acre tract. However, all of that acreage was in the borrow pit and therefore constituted non-compensable batture. Moreover, John Alwood, the owner of Allred Land Company, testified that levee contractors had constructed a ramp off the levee across his property which he requested be left in place. The contractors refused and removed the ramp. John Alwood claimed that without the ramp, he now has no access to his property located on the river side of the property. John Alwood's testimony, however, failed to show how the levee project caused him to lose access to the property. He testified that an older ramp existed, but it had partially washed away over the years. While he could walk over the ramp, he did not recall ever being able to drive across it.

The only thing his testimony mentioned as cutting off his access to the property was the removal of the newly constructed ramp. In La.R.S. 38:301(C)(1)(h), the law provides that:

> The measure of damages, if any, to the remaining property of the owner by reason of the use or destruction of a portion of the property is determined on a basis of immediately before and immediately after the use or destruction of the property for levee drainage construction, taking into consideration the effects of the completion of the project in the manner proposed or planned.

Immediately before construction began, this complained of ramp did not exist and it was removed at the end of the project. Removal of the temporary ramp cannot support an award of damages.

With respect to the Delhi Plantation property, much of the claimed severance damage is for acreage within the borrow pit area and is therefore non-compensable batture. However, even for the acres that were not in the batture, Plaintiffs failed to present any testimony to establish the amount of any loss in value for any severed property or how the value of the loss wasn't subsumed in the value of the servitude for which they were compensated. The trial court erred in awarding compensation for loss of access, and as such the awards to Delhi Plantation and Allred Land Company are reversed.

## DISMISSAL OF DOTD

In their last assignment of error, Defendants contend that the trial court erred in failing to dismiss DOTD. Prior to trial, DOTD filed an exception of no cause of action arguing that the Levee Board was the one who did the taking and DOTD is not liable for any compensation. Plaintiffs argued that DOTD is a joint actor with the Levee Board because the Levee Board relied on DOTD's

determination of batture when making their initial offers. We find that the trial court should have granted DOTD's exception.

The exception of no cause of action "is designed to test the legal sufficiency of the petition to determine whether the plaintiff is afforded a remedy in law based on the facts alleged in the petition." *Ebey v. Avoyelles Par. Sch. Bd.*, 03-765, p. 4 (La.App. 3 Cir. 12/17/03), 861 So.2d 910, 912, *writ denied*, 04-196 (La. 3/26/04), 871 So.2d 349. "[T]he exception is tried on the face of the petition, with supporting documentation," and "the well-pleaded facts in the petition must be accepted as true." *Id.* Plaintiffs are seeking compensation for the taking of their property and damages caused by the taking. By the well-pleaded facts of their petition, that taking was done by the Levee Board, not DOTD. As this case involves an appropriation by a levee district, the cause of action is governed by La.R.S. 38:301. The statute provides that "after the taking, use, damage, or destruction of the property. . . the levee board shall pay the owner[.]"

In this case, compensation is only authorized from the levee board for the appropriation. Thus, Plaintiffs have no cause of action against DOTD. Because the statute does not provide a cause of action against DOTD, we find that Plaintiffs have failed to state a cause of action against DOTD, and the trial court erred in denying DOTD's exception of no cause of action. We dismiss Plaintiffs' petition against DOTD with prejudice.

IV.

**CONCLUSION**

For the foregoing reasons, the award of the trial court is reversed and DOTD is dismissed with prejudice. Judgment is rendered in favor of Plaintiffs and against the Levee Board in the following amounts:

24

**Richard Alwood—$57,819.05**

| | |
|---|---:|
| ($2,850.00/acre x 90% x 1 acre non-batture borrow) = | $2,565.00 |
| + ($2,850.00/acre x 90% x (9.38 acres+2.43 acres berm)) = | $30,292.65 |
| + ($2,850.00/acre x 40% x. 3.33 acres temporary) = | $3,796.20 |
| + lost CRP = | $21,165.20 |

**Delhi Plantation—$26,529.86**

| | |
|---|---:|
| ($2,850.00/acre x 90% x 1 acre non-batture borrow) = | $2,565.00 |
| +($3,850.00/acre x 90% x (1.58+2.95+0.49 acres berm)) = | $17,394.30 |
| +($3,850.00/acre x 40% x 3.14 acres temporary) = | $4,835.60 |
| + lost CRP = | $1,734.96 |

**Allred Land Company—$18,052.65**

| | |
|---|---:|
| ($2,850.00/acre x. 90% x 0 acres non-batture borrow)= | $0.00 |
| +($3,850.00/acre x 90% x (1.71+3.63-0.49 acres berm))= | $16,805.25 |
| +($3,850.00/acre x.40% x 0.81 acres temporary) = | $1,247.40 |
| + lost CRP = | $0.00 |

**REVERSED AND RENDERED.**